*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| SARAH D., | ) | |
| | ) | Supreme Court No. S-15288 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-12-11124 CI |
| v. | ) | |
| | ) | O P I N I O N |
| JOHN D., | ) | |
| | ) | No. 7015 – June 12, 2015 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Patrick J. McKay, Judge.

Appearances: Phyllis A. Shepherd, Anchorage, for Appellant. Notice of nonparticipation filed by Kenneth M. Wasche, Kenneth M. Wasche, P.C., Anchorage, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

WINFREE, Justice.

## I.     INTRODUCTION

Sarah D. and John D. separated shortly after their daughter turned three. Each claimed that the other was abusive and obtained a short-term domestic violence protective order after they separated; they later stipulated to a mutual no-contact order but violated it by continuing a sporadic romantic relationship. They sharply contested numerous domestic violence allegations and generally cast each other in a bad light throughout their divorce proceedings.

Sarah requested interim attorney's fees. After the superior court denied her request, Sarah consented to her lawyer's withdrawal. Sarah and John then agreed to a property settlement. Before litigating custody Sarah again requested interim attorney's fees and twice filed continuance motions requesting time to obtain counsel. Her motions were denied, and she appeared pro se throughout a four-day custody trial. John's parents helped pay for his lawyer, and he was represented at all times. Over Sarah's objections, John's father was allowed to intervene as a party for visitation purposes.

Finding John and Sarah's relationship dysfunctional, Sarah manipulative and guilty of one incident of domestic violence, and neither party credible, the court awarded shared physical and sole legal custody to John and gave John's father unspecified visitation during John's custodial time. Sarah appeals the court's denials of her requests for an interim fee award, trial continuances, and to compel a witness's attendance at trial. She also appeals the court's orders granting the grandfather intervention and visitation and the court's domestic violence finding and custody decision. We vacate the order granting the grandfather visitation and otherwise affirm all but the custody decision, remanding for more detailed findings and conclusions on domestic violence issues.

## II.    FACTS AND PROCEEDINGS

Sarah and John married in 2009 shortly after their daughter's birth. Their daughter was three years old when they separated in November 2012. At separation Sarah and John each obtained an ex parte short-term domestic violence order against the other, and Sarah filed for divorce. John was represented by counsel throughout the proceedings, and Sarah had counsel until she consented to his withdrawal in mid-March 2013.

In December 2012 Sarah and John each petitioned for a long-term domestic violence protective order against the other, but then voluntarily withdrew their petitions

and stipulated to a mutual no-contact order permitting them to text or email each other only about their daughter. Neither John nor Sarah honored the no-contact order; indeed, until a month before the custody trial began in late May 2013 they routinely violated the order to have consensual sex.

At the end of interim hearings in mid-January 2013 the parties agreed to a shared physical custody schedule. The superior court ordered John to continue making mortgage payments on the marital home, where Sarah and the daughter remained, and John moved in with his parents. The parties entered into a property settlement agreement in late March, and the court confirmed it a month later. John was to keep the marital home, but Sarah was to live there until May 31. Therefore, for the bulk of the time between their November 2012 separation and the late-May 2013 trial, John lived with his parents and Sarah continued to live rent-free in the marital home.

In early April Sarah asked the superior court to postpone the May custody trial until September. Sarah anticipated a qualified domestic relations order (QDRO) for her share of John's retirement but believed it would take "two to three months" before she would "actually have access to [those] funds." She asked for the continuance so that she could obtain the funds, retain counsel, and allow her new counsel to prepare for trial.[1] John responded that Sarah had "consented to the withdrawal of her attorney in March 2013" and that "inexcusable delay in employing new counsel" was not "a ground for continuance." John pointed out that during the February scheduling conference Sarah

_____

[1] During an earlier February trial scheduling conference, Sarah's then-attorney stated: "Her ability to proceed and, basically, establish funding for . . . a custody trial is negligible right now, because she doesn't have the funds to do so. I mean, she's probably going to be doing it alone if the court's going to proceed with custody. I'm already in arrears and I can't continue to do that." Sarah's attorney indicated that he would accept compensation from "an early QDRO order" but noted that he did not yet have Sarah's consent to such an arrangement.

had anticipated a May custody trial. The court denied Sarah's motion for a continuance without comment.

In late April the superior court issued a divorce decree, noting that the parties had agreed to proceed to trial over custody. The court also issued Sarah a QDRO giving her a percentage of John's retirement benefit worth about $16,000.

Also in late April John's stepfather, John L. D. (JL), sought grandparent visitation with John and Sarah's daughter. JL, who is retired, often watched John and Sarah's daughter when they were working. According to JL, "[h]e has cared for [his granddaughter] on a frequent basis since her birth [and since] the parties have separated, both parties have continued to use [JL] as [a] caregiver." JL argued that Sarah had tried to cut him out of the child's life, that he was a psychological parent to the child, and that it was "in the best interests of [his granddaughter] to enjoy the benefits of a close relationship with extended family members by having regular, predictable contact." The court allowed JL's participation for the limited issue of grandparent contact with the parties' daughter.[2] Sarah asked the superior court to reconsider JL's intervention, arguing that the order "unnecessarily infring[ed] on the inherent rights of a good parent" and that she had evidence that JL's "open hostility" toward her had a negative impact on her daughter. The superior court denied the reconsideration motion at the beginning of trial.

In early May Sarah asked the superior court for either $10,000 in interim attorney's fees or a three-week continuance of the custody trial. She argued that she had no "funds to retain legal counsel" and that she was in the "final stages of retaining *Pro Bono* Legal Services" but could not do so without a continuance. Sarah argued that the

---

[2] Although JL, acting pro se, requested to be joined as a party under Alaska Civil Rule 18, and the court granted his motion to join in part, we interpret JL's request as a motion to intervene under Rule 24 and treat it accordingly.

continuance was necessary for her to "have a chance to fairly present her side [of the case] and have it heard." John responded that the parties' economic situations were comparable and that Sarah already had received the QDRO and could have assigned the proceeds to her former attorney in lieu of payment. John noted that the court had rejected Sarah's April continuance request and that she should not be able to avoid litigation by simply hiring or attempting to hire a new attorney and claiming the new attorney needed time to become familiar with her case. At a mid-May scheduling conference, the court indicated it likely would deny Sarah's motion. Twenty days after the custody trial ended the court formally denied Sarah's requests for a continuance and attorney's fees.

A week before trial Sarah sought to compel Sarah and John's marriage counselor to testify. She noted that the superior court already had indicated such an order would be proper — at a much earlier hearing Sarah's former attorney had mentioned that he planned to "seek a court order . . . to get [the marriage counselor's] testimony," and the court had responded: "Right. You would probably get it." She argued that the counselor's testimony would show that: John possibly had neglected their child; during counseling John had said that his family would lie under oath for him; and Sarah had never been violent toward John. The court denied the motion the next day, stating that Sarah "may subpoena [the witness] and then move to enforce or compel."

Sarah and John litigated custody for four days in late May and early June 2013. After trial the superior court found that: Sarah and John did not comprehend the dysfunctional nature of their relationship which "interfered in their ability to co-parent"; their "chaotic relationship" had the "potential for emotional abuse of [their daughter]"; but John "is more likely to disengage and maker healthier decisions for [their daughter] with his family support system," whereas Sarah "is manipulative and less capable of

setting aside emotional factors when making decisions about [their daughter's] best interest." But the court also found both parents could meet their daughter's needs and "[b]oth parents are willing and able to foster a relationship between the other parent and [their daughter]."

With respect to the competing domestic violence allegations, the court determined only that Sarah had "committed one act of domestic violence" against John. After weighing the best interests of the child factors, the court awarded shared physical custody but granted John sole legal custody, provided he continue to consult with Sarah "on important decisions." The court also ordered "grandparent visitation [to] occur during the parental custodial time."

Sarah appeals; we group her numerous points on appeal as follows: (1) whether it was error to deny her interim attorney's fees; (2) whether it was error to deny her a custody trial continuance; (3) whether it was error not to compel the marriage counselor's trial testimony; (4) whether it was error to allow JL to participate in the trial and to award him "de facto" custody of their daughter during John's custodial time; and (5) whether the legal and physical custody rulings were erroneous because (a) the court clearly erred in finding John as willing to foster a relationship between Sarah and their daughter and (b) the court did not account for John's domestic violence. John has not participated in this appeal.

## III. DISCUSSION

### A. The Superior Court Did Not Abuse Its Discretion When It Declined To Award Sarah Interim Attorney's Fees.[3]

Under AS 25.24.140(a)(1) the superior court may award "attorney fees and costs that reasonably approximate the actual fees and costs required to prosecute or defend the [divorce] action" so long as such an award "does not contribute to an unnecessary escalation in the litigation." "The purpose of this statute is to 'assure that both spouses have the proper means to litigate the divorce action on a fairly equal plane.' "[4] Whether to award interim attorney's fees to a divorcing spouse "is committed to the sound discretion of the trial court"[5] and primarily takes into account "the relative economic situations and earning powers of the parties."[6] "A party's economic situation includes the divorce property division, and a party who receives a property settlement

---

[3] We review the denial of interim attorney's fees in a divorce proceeding for abuse of discretion. *Limeres v. Limeres*, 320 P.3d 291, 296 (Alaska 2014); *id*. at 302 (stating superior court did not abuse its discretion in declining to award additional interim attorney's fees). A superior court has "broad discretion" over interim fee awards, and its decision "will not be disturbed on appeal unless it is 'arbitrary, capricious, manifestly unreasonable, or stems from an improper motive.' " *Lone Wolf v. Lone Wolf*, 741 P.2d 1187, 1192 (Alaska 1987) (quoting *Brooks v. Brooks*, 733 P.2d 1044, 1058 (Alaska 1987)).

[4] *Limeres*, 320 P.3d at 302 (quoting *Heustess v. Kelley-Heustess*, 259 P.3d 462, 479 (Alaska 2011)); *accord Lone Wolf*, 741 P.2d at 1192.

[5] *Burrell v. Burrell*, 537 P.2d 1, 7 (Alaska 1975).

[6] *Lone Wolf*, 741 P.2d at 1192. A superior court may also consider "whether the property was divided equally and whether an equal amount in attorney's fees was expended by the parties." *Siggelkow v. Siggelkow*, 643 P.2d 985, 989 (Alaska 1982) (citing *Johnson v. Johnson*, 564 P.2d 71, 77 (Alaska 1977)).

sufficient to cover incurred attorney's fees should expect to pay his or her own fees."[7] "When the parties' economic situations and earning capacities are comparable, each party should bear his or her own costs."[8]

During the December 2012 interim hearings the superior court recognized that there was not a "pot of money" from which to award interim fees. During the January 2013 interim hearings the court explained to Sarah's lawyer:

> I can't order [John] to borrow money from his parents. I mean, I can't do that. . . . I'm not going to say, [John] you're going to pay $10,000. That immediately puts [John] in the red. I mean, I have to look at what's available before I can start making sure that the attorneys are paid, and things to that nature.
>
> . . . .
>
> I would, if you want to try to get a QDRO, I'm willing to cooperate in that . . . in order to pay you. But what I'm not going to do is say, you get $10,000, and then you [counsel for Sarah] go ahead and start executing on [John's] paycheck, because that doesn't help . . . .

In mid-February Sarah's attorney indicated he would accept compensation from "an early QDRO order" but noted that he did not yet have Sarah's consent to such an arrangement. Sarah consented to her attorney's withdrawal in mid-March and the superior court approved the withdrawal in late April, about the same time the court issued a QDRO giving Sarah a portion of John's retirement plan worth about $16,000. The court confirmed the property agreement, awarding John the marital home but allowing Sarah to reside there until May 31. John contended at this time that although his parents had given him money "to assist with attorney's fees," making the court-

---

[7]  *Stevens v. Stevens*, 265 P.3d 279, 290 (Alaska 2011) (per curiam).

[8]  *Schmitz v. Schmitz*, 88 P.3d 1116, 1130 (Alaska 2004).

ordered mortgage payments on the marital home forced him to live with his parents and that he was "for all practical purposes, penniless."

On appeal Sarah argues that because John had a higher earning potential than she, the superior court abused its discretion by declining to award her interim fees. We have explained that "[t]he primary factors to be considered when awarding interim spousal support and attorney's fees are the parties' relative economic circumstances, earning capacities, and *ability to pay*. . . . [W]here the parties' economic situations and earning capacities are comparable, each party should bear his or her own costs."[9] We have previously concluded that it is not an abuse of discretion to withhold interim fees when the party being asked to pay them has "no obvious source of funds" from which to do so.[10]

Here there is no evidence suggesting John had the ability to pay for Sarah's attorney's fees. Throughout the proceedings the court was fully aware of the parties' relative economic positions. In December 2012 the court was aware that Sarah was working part-time and that John was temporarily between jobs. In January 2013 John testified that he had "been losing money for a long time," that he was behind on the marital home's mortgage, that he had not been steadily employed since separating from Sarah, and that he and Sarah "constantly had problems making bills" before they separated. At a February trial scheduling conference the court ascertained that a QDRO from John's retirement plan was "the only money" available for possible interim fees.

Sarah argues that the superior court should have considered the fact that John's parents were paying for his attorney before declining to award her any fees.

---

[9] *Hanson v. Hanson*, 125 P.3d 299, 309 (Alaska 2005) (emphasis added).

[10] *See, e.g.*, *Arrasmith v. Arrasmith*, Mem. Op. & J. No. 1092, 2002 WL 1773383, at *3 (Alaska July 31, 2002).

Although outside financial support for litigation expenses may in some cases alter a party's economic condition under the divorce exception's fee-shifting inquiry,[11] this is not such a case. Even with his parents' financial assistance, John was forced to move in with them to comply with the court-ordered mortgage payments he had been making on the marital home. John's parents' financial support did not change his inability to pay Sarah interim attorney's fees.

We also note that "[a] party's economic situation includes the divorce property division, and a party who receives a property settlement sufficient to cover incurred attorney's fees should expect to pay his or her own fees."[12] Sarah received a QDRO in late April giving her a portion of John's retirement benefit worth about $16,000. Shortly after receiving the QDRO, Sarah related to the court that she owed her attorney $7,000 and needed "time to retain funds to retain counsel." Sarah's attorney had previously indicated he was amenable to an assignment of Sarah's QDRO but was uncertain whether Sarah would agree to one.

The superior court was aware of the QDRO and its order that Sarah remain in the marital home and John pay the mortgage throughout the litigation, both of which properly could have influenced the court's attorney's fees decision.[13] Accordingly, we

---

[11] *See, e.g.*, *Dennis Q. v. Monika M.*, Mem. Op. & J. No. 1499, 2014 WL 1888270, at *8 (Alaska May 7, 2014).

[12] *Stevens*, 265 P.3d at 290.

[13] *Cf. Osterkamp v. Stiles*, 235 P.3d 178, 192 (Alaska 2010) (accounting for the father's occupation of the home — the parties' "largest and only significant equity" — during the divorce-like proceedings when affirming an award of interim fees against him); *Arrasmith*, 2002 WL 1773383, at *3 (affirming denial of wife's request for attorney's fees in part because superior court properly considered husband's obligation "to make substantial additional payments" to wife to effectuate the marital property
(continued...)

cannot say that the denial of interim fees was arbitrary, capricious, manifestly unreasonable, or stemmed from an improper motive.

## B.    The Superior Court Did Not Abuse Its Discretion When It Denied Sarah's Continuance Motions.[14]

We will find an abuse of discretion in denying a continuance " 'when a party has been deprived of a substantial right or seriously prejudiced.' "[15]  A parent's "right to seek custody . . . is a substantial one which the courts strive to protect."[16]  When a party's request for a continuance stems from the withdrawal of counsel, the party's lack of diligence in retaining new counsel weighs against granting the continuance.[17]  Whether a continuance was properly denied turns on the particular circumstances of each case, but courts should "balance the need[] for . . . promptness with the right[] to fair

---

[13]    (...continued) distribution).

[14]    "We 'will not disturb a trial court's refusal to grant a continuance unless an abuse of discretion is demonstrated.' "  *Sagers v. Sackinger*, 318 P.3d 860, 863 (Alaska 2014) (quoting *Greenway v. Heathcott*, 294 P.3d 1056, 1062 (Alaska 2013)); *accord Gregoire v. Nat'l Bank of Alaska*, 413 P.2d 27, 33 (Alaska 1966) ("[A] trial court's refusal to grant a continuance will not be disturbed on appeal unless an abuse of discretion is demonstrated."), *cert. denied*, 385 U.S. 923 (1966).  When reviewing the denial of a continuance motion we "will consider 'the particular facts and circumstances of each individual case to determine whether the denial was so unreasonable or so prejudicial as to amount to an abuse of discretion.' "  *Sagers*, 318 P.3d at 863 (quoting *Greenway*, 294 P.3d at 1062).

[15]    *Siggelkow v. Siggelkow*, 643 P.2d 985, 986-87 (Alaska 1982) (quoting *Barrett v. Gagnon*, 516 P.2d 1202, 1203 (Alaska 1973)); *see also Gregoire*, 413 P.2d at 33.

[16]    *House v. House*, 779 P.2d 1204, 1207 (Alaska 1989).

[17]    *See Barrett*, 516 P.2d at 1203.

presentation of the case."[18]  " 'Because of the necessity for orderly, prompt[,] and effective disposition of litigation and the loss and hardship to the parties and witnesses,' a motion for continuance should be denied absent a 'weighty reason to the contrary.' "[19]

In mid-February 2013 Sarah learned that the custody trial was scheduled for mid-May. A month later Sarah consented to her attorney's withdrawal, and the court approved the withdrawal in late April. Sarah then twice requested continuances, asking the court in early April to postpone the trial until September and asking the court again 20 days before trial for a three-week continuance. Both motions were denied.

Sarah argues that her interest in the "care, custody and control" of her daughter is a substantial right that was seriously prejudiced when she was forced to litigate custody pro se. But the case she offers to show prejudice, *Fidler v. Fidler*,[20] is distinguishable. In that case the superior court attempted to notify a father of his custody trial date the day before trial, but the father appeared the next day expecting a status hearing, unrepresented and unprepared to litigate custody.[21] He was denied a continuance and trial proceeded, and his inability to effectively present exhibits or cross-examine the mother resulted in a temporary custody award to the mother.[22]

_____

[18]    *Sylvester v. Sylvester*, 723 P.2d 1253, 1256 (Alaska 1986) (citing *Siggelkow*, 643 P.2d at 987).

[19]    *Wagner v. Wagner*, 299 P.3d 170, 175 (Alaska 2013) (quoting *Shooshanian v. Dire*, 237 P.3d 618, 623 (Alaska 2010)).

[20]    296 P.3d 11 (Alaska 2013).

[21]    *Id.* at 12-13.

[22]    *Id.* at 13. We reversed the denial of the father's continuance motion because he was forced "to go to trial without being able to fairly present [his] case." *Id.* (quoting *Shooshanian*, 237 P.3d at 623) (internal quotation marks omitted). Before trial
(continued...)

Sarah, in contrast, knew of the custody trial three-and-a-half months in advance and consented to her attorney's withdrawal two-and-a-half months before trial. And, unlike Mr. Fidler, Sarah was able to impeach John during trial, successfully object to testimony, and admit numerous exhibits into evidence. The superior court also took pains to ensure that Sarah did not prejudice herself during the course of the proceedings by allowing her considerable latitude in her lines of questioning and by fully explaining trial processes and procedures to her. Finally, Sarah had two-and-a-half months in which to secure counsel before trial. "Prejudice resulting from a party's lack of diligence in securing an attorney does not afford a basis to obtain a continuance."[23]

For these reasons the superior court did not abuse its discretion when it declined to grant Sarah's continuance motions.

## C. The Superior Court Did Not Abuse Its Discretion With Respect To Witness Attendance.[24]

Sarah filed a motion to compel the parties' marriage counselor to testify at the custody trial, but the superior court denied her motion a week before trial, noting that she could "subpoena [the counselor] and then move to enforce or compel." Sarah did not

---

[22]    (...continued)
the court had unsuccessfully attempted to contact the father's lawyer, who was away on vacation. *Id*.

[23]    *Siggelkow*, 643 P.2d at 988; *see also Barrett*, 516 P.2d at 1203 (noting that when " 'no diligence in inducing counsel to remain in the case or in securing new counsel is disclosed,' " a continuance is generally not warranted (quoting *Benson v. Benson*, 204 P.2d 316, 318 (Nev. 1949))).

[24]    We review the adequacy of the superior court's assistance to a pro se litigant for abuse of discretion. *See Tracy v. State, Dep't of Health & Soc. Servs., Office of Children Servs.*, 279 P.3d 613, 617 (Alaska 2012); *Azimi v. Johns*, 254 P.3d 1054, 1059 (Alaska 2011).

do so but now argues on appeal that the court abused its discretion by failing to compel the counselor's testimony.

We believe the superior court discharged its duty to Sarah as a pro se litigant when it apprised her of the proper procedure to accomplish her goal.[25]  Because Sarah did not subpoena the marriage counselor as she had been advised to do, she cannot now claim error by the superior court.

## D.    We Vacate The Grandparent Visitation Order.[26]

### 1.    There was no reason to award JL visitation.

Sarah argues that the visitation award to JL — allowing him visitation "during the parental custodial time" — required *McTaggart* findings.[27]  We agree with Sarah that the visitation award is infirm, but for a different reason.  When the court asked JL during closing arguments whether he "would want some special time for visitation only if your son [John] didn't get a substantial amount of visitation time," JL responded in the affirmative.  At the end of closing arguments, the court indicated that it would only grant separate grandparent visitation if John did not "get a substantial amount of visitation time," and JL agreed to this arrangement.  The final custody decree split physical custody equally between Sarah and John.

---

[25]    *See Breck v. Ulmer*, 745 P.2d 66, 75 (Alaska 1987) ("[T]he trial judge should inform a *pro se* litigant of the proper procedure for the action he or she is obviously attempting to accomplish.").

[26]    " 'Whether the court applied the correct standard in a custody determination is a question of law we review de novo, determining the rule of law in light of precedent, reason, and policy.' " *Elton H. v. Naomi R.*, 119 P.3d 969, 973 (Alaska 2005) (quoting *Moeller-Prokosch v. Prokosch*, 27 P.3d 314, 316 (Alaska 2001)).

[27]    *See Evans v. McTaggart*, 88 P.3d 1078, 1089 (Alaska 2004) (requiring clear and convincing evidence that third party visitation is in child's best interests to protect parents' constitutional rights in their child's upbringing).

The court's visitation order does not provide concrete guidance for when grandparent visitation shall occur, stating only: "Given the physical custody schedule, the grandparent visitation shall take place during the . . . parental visitation, and they will not be given a special time for grandparent visitation." We do not construe the order to carve out dates from Sarah's custodial time and allocate the dates, against her wishes, to the grandparents. Instead it appears to merely, and unnecessarily, allow grandparent visitation during John's custodial time.

Because the record does not show that JL had ever truly been denied visitation with his granddaughter, and certainly not by John, there was no reason to formally award him visitation; we therefore vacate that order.[28]

### 2. There was no de facto custody award to the grandparents.

Sarah argues that because John lived with his mother and stepfather, worked frequently outside of Anchorage, and perhaps intended to seek more work out of town in the future, the award of physical custody to John was a de facto award of physical custody to the grandparents.[29] Sarah asserts that this type of custody award

---

[28]    Accordingly, we do not need to decide whether the superior court abused its discretion by allowing JL to intervene in the custody proceedings.

[29]    We infrequently have dealt with de facto custody arguments. In *Elton H. v. Naomi R.* we decided whether a temporary award of shared physical custody to the children's grandmother in Anchorage and an award of legal custody to the children's mother in Florida was in fact an award of legal custody to the grandmother given the mother's great geographical distance from her children. 119 P.3d at 974-75. We found no grant of de facto legal custody, reasoning that, "[l]ike a parent who has placed her child in boarding school, it becomes more difficult for [the mother] to ensure that her preferences regarding her children's education, discipline, morality, and religious instruction are carried out. This difficulty, however, does not deprive her of the right to make such decisions." *Id*. at 975. And in *Harvey v. Cook* the issue squarely before us was whether granting sole legal and physical custody to the father, who was stationed

(continued...)

requires clear and convincing evidentiary findings under *McTaggart*.[30]  Speculating that

John was working out of town during the custody trial and that he plans to do so again,

Sarah argues that John "was positioning his parents to exercise *de facto* physical custody

of [John and Sarah's daughter] for him *if* he chose to work out of town."  (Emphasis

added.)  But, as the hypothetical connotation of Sarah's language suggests, John's

absence, and therefore  de facto physical custody, is only a possibility, and John's living

situation did not transform the grandparents into de facto custodians.[31]  We note,

however, that if John does begin full-time work outside of Anchorage while leaving his

daughter in her grandparents' physical custody, Sarah remains free to test her de facto

custody arguments through a custody modification motion under AS 25.20.110.

E.      **We Remand The Custody Decision For More Detailed Findings.**

1.      **The superior court's domestic violence findings are insufficient for appellate review.**

The superior court must make detailed findings on alleged incidents of

domestic violence.[32]  "[T]he requirement that . . . trial judge[s] file findings of fact"

assures us that they have "exercised care in ascertaining the facts, and ha[ve] employed

---

[29]      (...continued)
overseas, was in fact a grant of physical custody to the father's new wife requiring *McTaggart* findings, but the father returned home before we decided the case, mooting the issue. 172 P.3d 794, 796-98 (Alaska 2007).

[30]      *See supra* note 27.

[31]      In fact, such living arrangements sometimes support a parent's custody argument. *Cf. Green v. Parks*, 338 P.3d 312, 314 (Alaska 2014) (holding superior court did not clearly err in finding mother provided a stable living environment under AS 25.24.150(c)(5) in part because mother testified she and her child were living with mother's parents "who assisted with childcare when [mother] was at work or in class").

[32]      *See Faye H. v. James B.*, ___ P.3d ___, Op. No. 6997 at 9, 2015 WL 1743199, at *4 (Alaska April 17, 2015).

both skill and judgment in reducing [their] thoughts on contested matters to precise and pertinent findings while the evidence is still fresh in [their] mind[s]."[33] "[D]etailed and explicit findings" are necessary on appeal to give us " 'a clear understanding of the basis of the trial court's decision, and to enable [us] to determine the ground on which the trial court reached its decision.' "[34] Because the findings here do not achieve this purpose, we remand to allow the superior court to make more specific findings of fact regarding all of the domestic violence allegations.[35]

Alaska Statute 25.24.150(g) creates the "rebuttable presumption that a parent who has a history of perpetrating domestic violence against the other parent" may not be awarded legal or physical custody of the child. A history of domestic violence exists if "the court finds that, during one incident of domestic violence, the parent caused serious physical injury or the court finds that the parent has engaged in more than one incident of domestic violence."[36] The presumption against awarding custody to a parent with a history of domestic violence "may be overcome by a preponderance of the evidence" if "the perpetrating parent has successfully completed an intervention program

---

[33] *Merrill v. Merrill*, 368 P.2d 546, 548 (Alaska 1962); *see also* Alaska R. Civ. P. 52(a); *John N. v. Desiree N.*, Mem. Op. & J. No. 1460, 2013 WL 1933133, at *5 (Alaska May 8, 2013) (stating that when a trial court changes its mind regarding whether an incident rose to the level of domestic violence, there should be "findings sufficient to explain any significant change in the . . . perspective between one hearing and the next").

[34] *Merrill*, 368 P.2d at 548 (quoting *Irish v. United States*, 225 F.2d 3, 8 (9th Cir. 1955)).

[35] *See, e.g.*, *Williams v. Barbee*, 243 P.3d 995, 1003-04 (Alaska 2010) (summarizing our domestic violence custody cases and remanding for superior court to consider whether single severe choking incident amounted to a history of domestic violence under AS 25.24.150(h), which provides that one domestic violence incident causing "serious physical injury" establishes a history of domestic violence).

[36] AS 25.24.150(h).

for batterers"[37] — or completes similar counseling to satisfy the court that the presumption has been overcome[38] — "does not engage in substance abuse,"[39] and "the best interests of the child require" the parent with a history of domestic violence to participate "as a custodial parent" in the child's life.[40]

When both parents have a history of perpetrating domestic violence the superior court must either: (1) award custody "to the parent who is less likely to continue to perpetrate the violence and require that the custodial parent complete a treatment program"; or (2) if necessary to protect the child's welfare, award custody "to a suitable third person if the person would not allow access to a violent parent except as ordered by the court."[41] If both parents have a history of domestic violence, but the court "finds that neither parent is more likely than the other to continue to perpetrate the violence," the court may in its discretion determine that AS 25.24.150(g)'s presumption against custody applies to neither parent, in which case the court "should consider the remaining best-interests factors in making its custody decision."[42] When determining whether the presumption against custody applies because neither parent is more likely than the other to continue perpetrating domestic violence, courts must "take a holistic or

---

[37]    *Id.*

[38]    *Id. See also Stephanie F. v. George C.*, 270 P.3d 737, 753 (Alaska 2012) (holding "that the rebuttable presumption . . . may be overcome by means other than the completion of an intervention program for batterers").

[39]    AS 25.24.150(h).

[40]    *Id.*

[41]    AS 25.24.150(i); *see also* AS 25.24.150(j) (requiring parent with history of domestic violence to take certain affirmative steps before supervised or unsupervised visitation can be awarded).

[42]    *Mallory D. v. Malcolm D.*, 290 P.3d 1194, 1207 (Alaska 2012).

qualitative approach" and not "merely count[]" each parent's domestic violence incidents.[43]  Particularly "heinous" or "egregious [acts of] domestic violence" may suggest that one parent is more likely than the other to continue perpetrating violence, especially when the other parent's domestic violence is "comparatively minor."[44]

Under AS 25.24.150(g) superior courts *must* "consider alleged incidents of domestic violence," and when dealing with pro se litigants, "the trial court should solicit from the parties the information it needs to determine whether [certain incidents are] act[s] of domestic violence."[45]

> **a.    The parties' testimony and evidence indicate there were allegations of serious incidents of domestic violence that were not addressed by the superior court.**

> **i.    The separation incident involving a car seat**

In November 2012 John and Sarah argued over who could use their daughter's only car seat, and this "emotionally ugly" incident resulted in their separation. Sarah asked John if she could use the car seat, and he responded by locking the vehicle containing the car seat.  John testified that Sarah then became "very irate and hostile towards" him.

When Sarah threatened to call the police, John called JL and asked him to come over.  When JL arrived, Sarah locked the front door, and John told JL to run around to the back door.  Sarah claims John restrained her to allow JL to get inside, but John testified that as he was opening the back door for JL, Sarah slammed into it and scared him.  Sarah did not contradict John's testimony that their daughter stood between

---

[43]    *Id.*

[44]    *Id.*

[45]    *Parks v. Parks*, 214 P.3d 295, 302 (Alaska 2009) (per curiam); *accord Williams v. Barbee*, 243 P.3d 995, 1004-05 (Alaska 2010) (per curiam).

them crying during this incident. JL then came inside, picked up John and Sarah's daughter, and sat on the sofa, but Sarah took her daughter from him and went upstairs.

## ii. Protective order violations

In November 2012 John and Sarah each obtained 20-day ex parte domestic violence protective orders as a result of their car seat argument. Sarah's order against John was extended until December 31, 2012. Before the order expired, John and Sarah agreed to dismiss their petitions for long-term protective orders on the condition that the superior court issue a no-contact order instead.

The magistrate who issued Sarah's protective order against John wrote: "John admits that during the first part of their relationship he was a user of drugs and alcohol which negative[ly] affected his behavior. [H]e engaged in multiple acts of domestic violence during that time." The order forbade John from telephoning Sarah or "communicat[ing] in any way," except that he could call Sarah twice a day between noon and 8 p.m., subject to certain restrictions, and could also call to say goodnight to their daughter. The order forbade John from coming within 500 feet of the marital home where Sarah then resided.

Sarah admitted in December 2012 that she had violated John's protective order by calling him twice to discuss sex. Sarah also recalled "having [a] telephone conversation[] with John about what to do regarding the domestic violence cases" while the protective orders were in effect. John admitted during trial that he and Sarah "had sex many times since we split up."

On December 31, 2012, as the parties were contesting domestic violence allegations, the court cut them off and stated: "Let me tell you right now, unless something really shows up here, you both have a history of domestic violence. Violating

DV orders, that's domestic violence in and of itself."[46]  And the final custody decree states that both parties "disregard[ed]" their mutual protective orders.

### iii.  The Mother's Day incident

Through an affidavit Sarah contended that on Mother's Day in 2010 John came home drunk and began arguing with her.  She alleged that as the fight escalated John tried to see their daughter as she slept in her crib, but that Sarah placed herself between John and the crib.  According to Sarah, John then began strangling Sarah, and she scratched his face and pried his fingers from her neck.  By contrast John testified that he went to bed after coming home and awoke to Sarah pouring ice water on his head, angering and leading him to punch holes in the wall.  John testified Sarah punched him in the head repeatedly while accusing him of cheating on her.  As a result of this incident, John and Sarah's daughter woke up and began to cry.

John called the police, and Sarah was arrested because of the scratches on John's face, but Sarah also testified that she had told the officers not to arrest John.  Sarah testified that she was acting in self-defense and that after the incident John's face

---

[46]    AS 18.66.990(3)(G) defines domestic violence as "violating [or attempting to violate] a protective order under AS 11.56.740(a)(1)."  AS 11.56.740(a)(1) makes it unlawful to "knowingly commit[] or attempt[] to commit an act with reckless disregard that the act violates or would violate a provision of the protective order" "listed in AS 18.66.100(c)(1)-(7)."  Under AS 18.66.100(c)(2) Sarah's protective order against John prohibited "communicat[ing] in any way" with certain exceptions.  John's protective order against Sarah does not appear in the record, although his request to dissolve it because he no longer feared her does.  In short, if the parties met to have sex or otherwise communicated while their mutual protective orders were in place, and if John's order was similar to Sarah's, then they both were committing domestic violence, and the court should have accounted for each party's protective order violations in its custody analysis, especially after having found that both John and Sarah "disregard[ed]" the protective orders.  *See* AS 25.24.150(c)(7), (g)-(k).

was scratched, his nose bloodied, and his eye swollen shut.[47] John later wrote Sarah a letter accepting fault for the Mother's Day incident, admitting he had choked Sarah and she had acted in self-defense. In another apology letter to Sarah, John wrote that he was "sorry for putting [his] hands on [Sarah] in anger." But John later testified he had never assaulted Sarah, and that Sarah blackmailed him into writing these letters by threatening to take their daughter from him.

Although John and Sarah disputed who instigated the Mother's Day incident and the fight's precise contours, they agreed it occurred. Upon hearing the parties' testimony for the first time, the court remarked that "clearly . . . some injury . . . happened. . . . [B]oth parties probably have engaged in domestic violence."[48] But the court later found in its final custody decree that "neither party sustained their burden of proof" with respect to numerous domestic violence allegations without making specific findings of fact as to each allegation. A blanket statement that neither party was "particularly credible" does not relieve the court from resolving domestic violence allegations in the context of child custody proceedings, nor does it relieve the court from explaining why its mind changed during the course of the proceedings. The Mother's Day incident was perhaps the most egregious domestic violence allegation and should not have been ignored.[49] Based on the evidence in the record, either John strangled

---

[47]      Sarah also presented two affidavits from coworkers attesting to her bloodied eye and bruised neck, and the court admitted exhibits into evidence showing John's bruised, swollen, and scratched face.

[48]      *See* AS 18.66.990(3)(A) (defining the crime of assault in the fourth degree — "recklessly caus[ing] physical injury to another person," AS 11.41.230(a)(1) — as domestic violence).

[49]      *Cf. Michele M. v. Richard R.*, 177 P.3d 830, 835-38 (Alaska 2008) (holding that when a court fails to consider its own domestic violence findings from an earlier (continued...)

Sarah, Sarah punched and scratched John, or they fought each other, in which case the superior court should have made additional findings on whether John or Sarah acted in justifiable self-defense.[50]

### iv.    Punching holes in the wall

Sarah argues that "punching holes in the wall of the marital home . . . could constitute an act of criminal mischief under AS 11.46.484(a)(1)."[51]  John testified that after Sarah poured water on him during the Mother's Day incident, "I got up, and I was noticeably disoriented and angry.  [Sarah] walked away, and I walked over and I hit the

---

[49]    (...continued)
proceeding, as well as "unrebutted testimony by a witness as to the existence of domestic abuse," it is "plain error for the court not to further determine whether [the] previous acts of domestic violence constituted a history of perpetrating domestic violence under AS 25.24.150(h)" (internal quotation marks omitted)); *Thomas v. Thomas*, 171 P.3d 98, 106 (Alaska 2007) (holding, in custody case where father pled no contest to assault, that "[t]he evidence of domestic violence in this case cannot accurately be characterized as 'insignificant' or 'muddy.'  The superior court was presented with uncontroverted evidence of a serious episode of domestic violence, and its failure to thoroughly consider that issue and address it in its findings was clearly erroneous."); *Puddicombe v. Dreka*, 167 P.3d 73, 77 (Alaska 2007) ("[W]hen the record shows that domestic violence has occurred and the court so finds, it is plain error for the court not to make findings as to whether the domestic violence amounted to a history of perpetrating domestic violence.  If such a history is found then the path charted in subsection .150(g)-(i) must be followed.").

[50]    *See Dennis Q. v. Monika M.*, Mem. Op. & J. No. 1499, 2014 WL 1888270, at *6 (Alaska May 7, 2014) (explaining that domestic violence self-defense claims are "subject to the necessity and proportionality requirements that apply to all other self-defense claims involving non-deadly force" (citing AS 11.81.330(a))).

[51]    AS 11.46.484(a)(1) makes it a crime to intentionally "damage[] *property of another*" without the "right to do so or any reasonable ground to believe . . . such a right" exists. (Emphasis added.)  *See* AS 18.66.990(3)(E) (classifying criminal mischief as domestic violence).

wall twice. And I put two holes in the wall, right next to the doorway. At that point she was standing . . . in the hallway . . . ." John also testified that he owned the house, and Sarah agreed.

In *Stephanie F. v. George C.* we affirmed the superior court's finding that punching a bathroom door during an argument was domestic violence because the mother in that case co-owned the home.[52] But we also stated: "At the outset, we reject the suggestion that ownership of a door determines whether punching a hole in it during an argument, in the presence of one's spouse, can constitute domestic violence. Placing another person in fear of imminent physical injury 'by words or other conduct' is assault."[53] Therefore even if John owned the marital home outright, he still may have assaulted or attempted to assault Sarah by punching holes in their bedroom wall while she stood in the nearby hallway.

### v. The knife-brandishing incident

John admitted during an interim hearing — and again at trial — that he had brandished a knife and threatened to kill Sarah's dog and slash her tires as she was walking away from him. If John "recklessly place[d] . . . [Sarah] in fear of imminent physical injury" or attempted to do so,[54] then this was an act of domestic violence that should have been factored into the custody analysis under AS 25.24.150(g)-(i).[55]

---

[52]    270 P.3d 737, 740, 750-51 (Alaska 2012).

[53]    *Id*. at 750 n.35 (quoting AS 11.41.230). *See also* AS 18.66.990(3)(A) (classifying assault as domestic violence).

[54]    AS 11.41.230(a)(3).

[55]    *See* AS 18.66.990(3)(A).

### b. The superior court made inconsistent statements about the domestic violence incidents.

In December 2012 the court stated, "Violating DV orders, that's domestic violence in and of itself." In January 2013 the court stated that it "certainly had testimony from both parties regarding incidents of domestic violence against each other, including the separation [incident] and the Mother's Day incident where [Sarah] was arrested." The court then stated, "Clearly there is some injury that happened. . . . [B]oth parties probably have engaged in domestic violence."

In August 2013 the superior court issued findings of fact and conclusions of law. The court found that Sarah "was arrested for DV on Mother's Day 2010 and the charges were dropped." The court also found that John and Sarah's "disregard for the Protective Orders and the no contact order heightened the litigation in this case." The court then contradicted statements it made during the December 2012 and January 2013 interim hearings by finding that although it had "received evidence of situational domestic violence, each against the other[,] . . . neither party sustained their burden of proof [for] a conclusion of law with the exception of one act when the parties separated." The court then concluded that Sarah "committed one act of domestic violence," presumably during the car seat incident that led to John and Sarah's separation.[56]

When denying Sarah's motion for reconsideration, the superior court stated that it did not believe the parties: their marriage was " 'drama' seeking," their testimony was incredible, and there was no proof of domestic violence because neither party was

---

[56] The superior court apparently concluded that the car seat incident constituted domestic violence under AS 18.66.990(3)(A), which brings "a crime against the person under AS 11.41" within the ambit of domestic violence. Under AS 11.41.230(a)(3) "[a] person commits the crime of assault in the fourth degree if . . . by words or other conduct that person recklessly places another person in fear of imminent physical injury."

"actually placed in fear of assault." Instead, the court concluded that their "situational acts" were merely "part of the dysfunctionality that permeated the parties['] time together."

### c. Sarah's appeal

On appeal Sarah argues that the superior court erred by not considering three acts of domestic violence: (1) John "putting his hands on [Sarah] in anger"; (2) John "punching holes in the wall of the marital home"; and (3) John "threatening to kill [Sarah's] dog and slash her tires." Sarah further argues that under *Parks v. Parks*, because she litigated custody pro se, the court should have solicited further information from her to determine which alleged incidents were acts of domestic violence.[57] We agree with Sarah.

Under Alaska law domestic violence encompasses both certain specified crimes and attempts to commit those crimes.[58] In the context of fourth degree assault, defined as "recklessly plac[ing] another person in fear of imminent physical injury,"[59] we have held that because domestic violence encompasses an attempted assault, "[i]t is irrelevant whether [the alleged victim] was actually placed in fear."[60] But the superior

---

[57]     214 P.3d 295, 302 (Alaska 2009) (per curiam).

[58]     AS 25.90.010 defines domestic violence by reference to AS 18.66.990, and AS 18.66.990(3) defines domestic violence as "one or more of the following offenses . . . *or an attempt* to commit the offense." (Emphasis added.)

[59]     AS 11.41.230(a)(3).

[60]     *Parks*, 214 P.3d at 300. ("Throwing water at [mother] was therefore 'domestic violence' . . . if [father], in doing so, 'attempted' to place [mother] in fear of imminent physical injury. . . . We therefore remand for a determination whether [father] attempted to place [mother] in fear of imminent physical injury when he threw water at her. If he did, the trial court must determine whether [father] has overcome
(continued...)

court found only one incident of domestic violence by reasoning that neither John nor Sarah was "actually placed in fear of assault." This was incorrect: it was not necessary for Sarah or John to actually fear one another; rather, to find domestic violence, the superior court should have determined whether Sarah or John "attempted" to place the other "in fear of imminent physical injury."[61] On remand the superior court should gauge the alleged perpetrator's intent rather than the victim's actual fear or lack thereof. If Sarah appears pro se, the court should solicit from her the information it needs to determine whether certain alleged incidents are in fact domestic violence.[62]

With respect to the numerous domestic violence allegations, the superior court's factual findings do not "allow us to glean from the record what considerations were involved."[63] On remand the superior court must consider the parties' allegations and testimony noted above and must make detailed and specific findings on the domestic violence allegations.[64]

---

[60] (...continued)
AS 25.24.150(g)'s presumption against joint legal custody."); *accord Harris v. Governale*, 311 P.3d 1052, 1058 (Alaska 2013) ("[N]o matter which person was the aggressor, an attempted assault occurred if the perpetrator *attempted* to put the victim in fear of imminent physical injury, regardless of success, and attempted assault is a domestic violence crime." (emphasis in original)).

[61] *Parks*, 214 P.3d at 300; *Harris*, 311 P.3d at 1058.

[62] *Parks*, 214 P.3d at 302.

[63] *Dragseth v. Dragseth*, 210 P.3d 1206, 1208 (Alaska 2009) (quoting *Smith v. Weekley*, 73 P.3d 1219, 1226 (Alaska 2003)).

[64] The superior court should consider on remand the strength of the domestic violence allegations in Sarah's "Testimonial Affidavit," including but not limited to: (1) John broke a bathroom door to get to her — John also admitted to kicking down a doorframe but when no one was around; (2) John threatened in some detail to kill her;

(continued...)

## 2. It was not clearly erroneous to find that John was willing to encourage Sarah's relationship with their daughter.[65]

Joint legal custody permits both parents to "share responsibility in the making of major decisions affecting the child's welfare" but is proper only if "the parents can cooperate and communicate in the child's best interest."[66] Sarah attacks the award

---

[64]    (...continued)
(3) John kicked the family dog down the stairs and laughed; (4) John kicked down the bedroom door; and (5) John threatened to kill Sarah's friend — at trial John equated murdering Sarah's friends to love. The court also should consider the strength of John's domestic violence allegations, including but not limited to: (a) Sarah once punched him in the side of the head; (b) Sarah threatened to kill him; and (c) Sarah threatened to break his wrists if he cheated on her.

In the event the superior court finds that either parent has a history of domestic violence under AS 25.24.150(h), we note that two of our recent decisions — *Kristina B. v. Edward B.*, 329 P.3d 202, 207-09 (Alaska 2014) and *Stephanie F. v. George C.*, 270 P.3d 737, 750-55 (Alaska 2012) — deal in some depth with overcoming the presumption against awarding legal or physical custody of a child to a parent with a history of domestic violence.

[65]    We review findings of fact in custody cases for clear error, *see Red Elk v. McBride*, 344 P.3d 818, 822 (Alaska 2015), and "find clear error when, after review of the entire record, 'we are left with a definite and firm conviction' a mistake occurred." *Wee v. Eggener*, 225 P.3d 1120, 1124 (Alaska 2010) (quoting *Dingeman v. Dingeman*, 865 P.2d 94, 96 (Alaska 1993)). "We give 'particular deference to the [superior] court's factual findings when they are based primarily on oral testimony, because the [superior] court, not this court, performs the function of judging the credibility of witnesses and weighing conflicting evidence.' " *Jaymot v. Skillings-Donat*, 216 P.3d 534, 539 (Alaska 2009) (quoting *Millette v. Millette*, 177 P.3d 258, 261 (Alaska 2008)); *see also Monsma v. Williams*, 385 P.2d 107, 110 (Alaska 1963).

[66]    *Jaymot*, 216 P.3d at 540 (quoting *Farrell v. Farrell*, 819 P.2d 896, 899 (Alaska 1991)) (internal quotation marks omitted).

of sole legal custody and shared physical custody to John on the ground that the court clearly erred by determining that John was willing to foster Sarah's relationship with their daughter.[67] We disagree.

The court's primary concern in crafting the custody award was the impact of John and Sarah's "chaotic" and "dysfunctional" relationship on their daughter's emotional well-being. The court found that John was "more likely to disengage and make healthier decisions for [their daughter]" whereas Sarah was "manipulative and less capable of setting aside emotional factors when making decisions about [their daughter's] best interest[s]." Therefore, even if Sarah were more willing than John to foster a relationship with the other parent in their daughter's best interests, the way she went about doing so could have negatively impacted their daughter. Although it is important for each parent to encourage the other parent's relationship with the child, the importance of this factor here was properly discounted by the court's findings that the parents' relationship was dysfunctional, but that John was better able to control his emotions.[68]

---

[67]     *See* AS 25.24.150(c)(6).

[68]     *See Green v. Parks*, 338 P.3d 312, 315 (Alaska 2014) (affirming favorable custody award to mother in part because superior court "found that [mother]'s reluctance to allow [father]'s family to spend time with their daughter was understandable to a certain extent, given [mother]'s difficult relationship with [father]"); *Riggs v. Coonradt*, 335 P.3d 1103, 1107 (Alaska 2014) ("On balance, the court viewed the likelihood that [father] would try to shut [mother] out as less harmful to the children than [mother]'s desire to use custody as a weapon against [father]."); *Limeres v. Limeres*, 320 P.3d 291, 298 (Alaska 2014) (affirming award of sole legal custody to mother in part because father "significantly and intentionally disparaged [the mother] in the presence of and directly to the children on multiple occasions"); *James R. v. Kylie R.*, 320 P.3d 273, 278 (Alaska 2014) (affirming award of primary physical custody to mother in large part because superior court reasoned that father's willingness to foster child's relationship

(continued...)

The record supports the superior court's findings. John's testimony shows he realized that he and Sarah were not great communicators and that the less they interacted, the less chance there would be for emotional harm to their daughter. Both John and JL testified that Sarah often berated them, and at custody exchanges in front of John and Sarah's daughter Sarah would sometimes deliver scathing comments and imply that John did not give her enough money to support their daughter. And John also testified that: he wanted his daughter to be a part of Sarah's life; he was willing to accept Sarah's input on an appropriate preschool for their daughter; he often invited Sarah to play-dates with him and their daughter; he supported Sarah's relationship with their daughter and did not bad mouth Sarah in their daughter's presence; he recognized and approved of the love between Sarah and their daughter; and he often encouraged goodnight telephone calls between Sarah and their daughter. Although there certainly is evidence to the contrary given John and Sarah's deeply troubled relationship, it was not clearly erroneous to find that John was willing to foster Sarah's relationship with their daughter.

Although this factual finding was not clearly erroneous, we do not address whether the superior court properly balanced the best interest factors because its findings regarding domestic violence were insufficient, and, even if the AS 25.24.150(g)-(i)

---

[68]    (...continued)
with mother was belied by father's extremely negative characterizations of mother throughout the trial); *Jaymot*, 216 P.3d at 541 (affirming award of sole legal custody to father in part because he was "more composed and capable of extracting himself from the anger of the moment").

restrictions on custody do not apply, it may have to "reevaluate on remand the relative weights" of the best interest factors under AS 25.24.150(c), as well as the domestic violence allegations.[69]

## IV. CONCLUSION

We VACATE the grandparent visitation order. We otherwise AFFIRM the superior court's rulings except for the custody decision, and REMAND to allow the superior court to enter more detailed and specific findings and conclusions on the relevant domestic violence issues and, if appropriate, enter a new custody decision. We retain jurisdiction.

---

[69] *See Williams v. Barbee*, 243 P.3d 995, 1006 (Alaska 2010).