Gail THOMAS, Appellant/Cross–Appellee,

v.

Kevin THOMAS, Appellee/Cross–Appellant.

Nos. S–12289, S–12330.

Supreme Court of Alaska.

Nov. 9, 2007.

David R. Edgren, Edgren Law Offices, LLC, Anchorage, for Appellant/Cross–Appellee.

Robert C. Erwin, Robert C. Erwin, LLC, Anchorage, for Appellee/Cross–Appellant.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

BRYNER, Justice.

## I. INTRODUCTION

Gail and Kevin Thomas divorced after a twenty-year marriage in which they raised nine children. The superior court gave Kevin custody of the six younger children. Gail appeals, arguing both that the superior court failed to make sufficient findings and that the findings it did make in support of its disposition were erroneous. We remand for further findings because the current record does not allow us to determine the bases for the superior court's decision. Kevin cross-appeals the portion of the court's decree characterizing a number of gold coins as Gail's separate property. We conclude that the superior court characterized the coins properly.

## II. FACTS AND PROCEEDINGS

Kevin and Gail Thomas were married in California in May 1984. They moved to Alaska soon after to manage some of Gail's father's properties. Several years later, using funds earned while working for Gail's father, they bought a trailer park and a piece of unimproved property. Kevin and Gail lived first in a trailer on the unimproved property, then in a cabin, and finally in a home Kevin built on the property.

Kevin and Gail had nine children: Michael, born 10/85; Christopher, 4/87; Julie (also known as Windy), 11/88; Gabriel, 2/93; Faith, 10/94; Theresa, 4/99; Job, 6/00; Mary, 3/02; and Ruth, 1/04. Generally, Kevin managed the trailer park and Gail took care of the children. The older children frequently helped care for the younger children. All of the children were home-schooled: Gail taught the younger children and Kevin taught the older children. Seven of the children were minors at the time of trial.

In the late 1980s or early 1990s, Gail and her sister received real property in Indiana as an "inheritance" from their father.[1] The sisters returned the Indiana property to their father in exchange for a down payment on an apartment complex in Anchorage. For approximately eight years, Kevin managed the apartment complex for Gail and her sister. Kevin was paid a management fee for this work. The property was sold in the 1990s.

Gail and her sister received approximately $60,000 each from the proceeds of the sale. Approximately $6,000 of Gail's share was tithed to the Thomases' church, $4,000 was spent on miscellaneous items, and $50,000 was used to purchase gold coins (or "bullion"). Since buying the gold, neither Kevin nor Gail exchanged it for money or otherwise used it. The coins were kept in a "vault" in the family house that Gail could not access.

---

1. The record is unclear as to whether Gail's father actually died.

Kevin and Gail began having marital difficulties in 2002. Gail moved into a domestic violence shelter in January 2005. That same month, she filed two requests for domestic violence protective orders against Kevin and one each against Michael and Chris. Gail was given temporary custody of the children and possession of the family home by the protective orders she obtained against Kevin, but later left the home and returned the children to Kevin because she did not have access to family resources to care for them. Gail eventually requested that each of her petitions be dissolved; her requests were granted.[2]

Gail filed a third request for a protective order against Kevin in February 2005 (3AN–05–538CI). She described the incident supporting her petition as follows:

2–21–05 Kevin Thomas entered the cabin where I was staying around 6:00 am. He started arguing with me, he pushed me out of the place where I was reclining. He bruised my neck while removing my cross [necklace]. He pounded my head into the floor many times, leaving a big bump. I have [repeatedly] asked Kevin Thomas not to talk to me. He shows constant disrespect to me in the presence of our children.

The court granted a protective order against Kevin and scheduled a hearing for a long-term order. Kevin was charged with assault by the Municipality of Anchorage (3AN–05–1588CR), arraigned, and released, all on the same day Gail filed her petition. Kevin was released on the condition that he not talk to Gail or go to the family cabin where Gail was staying. The hearing for the long-term order was rescheduled for March 2, 2005.

Magistrate Andrew M. Brown presided over the March 2 hearing. At the hearing, Kevin admitted that he had assaulted Gail. Magistrate Brown issued a long-term protective order against Kevin that gave Kevin temporary custody of the children and allowed Gail to visit with the children at the family cabin. Magistrate Brown also appointed a custody investigator to prepare a custody report. Approximately one week later, Kevin requested that the protective or-

der be modified so that he could contact Gail to attempt reconciliation. Magistrate Brown scheduled a hearing for Kevin's request to be held on March 17, 2005.

The custody investigator submitted her report on March 16, 2005. The investigator recommended that Kevin be awarded temporary custody and that Gail be able to visit with the six younger children for two overnight periods each week. At the March 17 hearing, Magistrate Brown denied Kevin's request to communicate with Gail for purposes of reconciliation. Magistrate Brown ruled orally on the record and later that day issued a written order that kept custody with Kevin and gave Gail visitation at the family cabin three days each week. Magistrate Brown also ordered that Kevin be allowed limited telephone contact with Gail to handle bills and other matters, but that he not approach the cabin while Gail was visiting with the children.

Kevin entered a plea of no contest to the assault charge in 3AN–05–1588CR on March 25, 2005. He was sentenced that same day; one of the conditions of his release was that he not contact Gail.

Meanwhile, in the midst of the domestic violence proceedings, Gail filed a pro se complaint for divorce on February 3, 2005. In his pro se answer of April 4, 2005, Kevin asserted that he was "prohibited by court order from fully answering" the complaint. District Court Judge Mary Anne Henry issued a written order on May 9, 2005, modifying the "no contact" provision in the criminal judgment to allow Kevin to "have direct or indirect contact with Gail ... for purposes of the divorce trial."

Anchorage Superior Court Judge Peter A. Michalski was assigned to the Thomases' divorce case. On May 11, 2005, he gave Kevin an extension of time to file an amended answer. Kevin filed a responsive amended answer, pro se, on June 3, 2005. Trial was originally set for December 2005. Kevin moved for a continuance before trial. Gail retained an attorney shortly before the initial trial date; the attorney filed a motion stating

---

2. The record does not reflect that Gail's second petition against Kevin was dismissed, but it

seems to have been closed without an express order.

that Gail was not opposed to a continuance. Trial was rescheduled for February 2006. At trial, Gail testified on her own behalf, while Kevin, Michael, and Julie testified on Kevin's behalf. The court did not appoint a custody investigator for the trial. At the end of trial, Judge Michalski took the matter under advisement, although he did order that Kevin not spend or trade the gold coins until the divorce decree was issued.

Judge Michalski issued a written divorce decree setting out findings of fact on March 30, 2006. He gave Kevin primary physical custody and sole legal custody of all the children. Judge Michalski gave the marital assets to Kevin and ordered him to pay Gail an offset for her share. Judge Michalski found that the gold coins were to be returned to Gail as her separate property. The decree did not address child support or set out a visitation schedule for Gail.

Gail filed a motion for reconsideration. She argued that the superior court had improperly applied the statutory factors when it awarded Kevin custody of the children and that it had erred by failing to provide her with a visitation schedule. On April 12, 2006, the court granted Gail visitation for the first three weekends of each month but otherwise affirmed its earlier decree.

Kevin then filed a motion for reconsideration. He argued that the court erred in changing the pre-existing visitation arrangement, requiring him to pay Gail an offset, and not awarding him child support. The court denied Kevin's motions as to visitation and property distribution but ordered Gail's attorney to prepare a child support order.

Both parties appealed. Gail challenged the superior court's application of the AS 25.24.150(c) best interest factors in awarding Kevin custody of the children. In his cross-appeal, Kevin challenged the court's characterization of the coins as Gail's separate property and claimed the superior court committed error by failing to require Gail to pay child support.

## III. DISCUSSION

### A. Custody Award

The central issue is whether the superior court properly awarded custody of the seven minor children to Kevin. We are unable to review the merits of the superior court's decision because its findings do not indicate which factors guided the court's custody disposition. We briefly discuss what factors were presented by the evidence in the record and also discuss the error in those findings that the court did make.

 We give the superior court broad discretion to determine custody awards in a divorce proceeding so long as the determination is in a child's best interests.[3] We will not reverse a superior court's custody determination unless it abused its discretion or its controlling factual findings are clearly erroneous.[4] The superior court abuses its discretion where it "consider[s] improper factors in making its custody determination, fail[s] to consider statutorily mandated factors, or assign[s] disproportionate weight to particular factors while ignoring others."[5] The superior court's factual findings are clearly erroneous if, after a review of the entire record, we are left with the definite impression that a mistake has been made.[6]

 In determining a child's best interests, the superior court must consider the nine factors set out in AS 25.24.150(c). We review the adequacy of findings for "whether they give a clear indication of the factors considered important by the trial court or allow us to determine from the record what considerations were involved."[7] The superior court need not discuss each of the factors; it must only address those that are "actually

3. *Elton H. v. Naomi R.,* 119 P.3d 969, 973 (Alaska 2005) (citing *Carter v. Novotny,* 779 P.2d 1195, 1198 (Alaska 1989)).

4. *Id.* at 973–74.

5. *Id.* at 974 (quoting *Fardig v. Fardig,* 56 P.3d 9, 11 (Alaska 2002)).

6. *Id.* (citing *Fardig,* 56 P.3d at 11).

7. *Borchgrevink v. Borchgrevink,* 941 P.2d 132, 137 (Alaska 1997).

relevant in light of the evidence presented."[8] It is preferable, but not necessary, for the court to set out "ultimate" or "wrap-up" findings that relate its factual findings to its legal conclusion that a certain custody disposition is in a child's best interests.[9]

■ Here, the superior court did not discuss either of the first two factors: "the physical, emotional, mental, religious, and social needs of the child," and each parent's "capability and desire" to meet those needs.[10] Gail argues that the superior court ignored these factors despite evidence that Kevin was raising the children in a harmful environment and would be unable to meet their need to have a relationship with her. Kevin argues that the children needed to be kept together and home-schooled, two needs that Gail could not, or would not, meet. The superior court erred in failing to discuss these factors given that the parties disputed what the children's needs were and who could best serve them.

Without express discussion by the court, we cannot accept Kevin's assertion that the record supports the court's determination on this issue. First, the record does not support Kevin's conclusion as to the younger children. Kevin defines the children's needs solely on the basis of the older children's testimony, which is inappropriate given that the older children, who are no longer minors, are not subject to the court's custody order. Additionally, the older children were solidly aligned with their father and their testimony regarding their younger siblings likely reflects this bias. We note that Gail was the primary caretaker for the younger children before her separation from Kevin, and there is no evidence in the record that she could not serve in this role in the future. Both Michael and Julie testified that Gail had done a good job raising them. Kevin does not argue that Gail is incapable of caring for the children; he only argues that she cannot meet the needs of the children as he defines them. The superior court's failure to make findings about these factors leaves us unable to determine whether the children's needs were properly considered.

We also note that we have never applied a presumption that siblings must remain together.[11] Whether it is advisable to keep children together depends on case-specific circumstances determining the children's best interests.[12] Here there is a four-year gap between the three older children and the six younger children. Thus, at least as between the children who are adults—and not subject to any custody order—and the younger children who remain covered by the custody order, a natural division exists. For this reason, even if we followed a rule declaring that custody orders should presumptively keep all siblings together, it would not be self-evident how it would "separate the children" in this case if all the children covered by the court's order were placed with Gail. The superior court's order applied only to the children Gail wanted custody of; the only exception was Julie, who would soon age out of the court's custody determination.

■■ The third statutory factor the superior court must consider is a "child's preference if the child is of sufficient age and capacity to form a preference."[13] A child's true preference is important in this calculus and an immature or improperly motivated preference should be discounted.[14] The superior court has discretion to determine whether a child is capable of forming a trustworthy preference.[15] In its divorce decree

8. *Virgin v. Virgin,* 990 P.2d 1040, 1045 (Alaska 1999) (quoting *Park v. Park,* 986 P.2d 205, 207 (Alaska 1999)).

9. *Virgin,* 990 P.2d at 1046–47 (quoting *Borchgrevink,* 941 P.2d at 139–40).

10. AS 25.24.150(c)(1)-(2).

11. *See Melendrez v. Melendrez,* 143 P.3d 957, 961 (Alaska 2006).

12. *Id.*

13. AS 25.24.150(c)(3).

14. *See Jenkins v. Handel,* 10 P.3d 586, 590–91 (Alaska 2000) (children's preferences properly rejected where they resulted from others' influences and the desire for greater "social and recreational opportunities"); *Rooney v. Rooney,* 914 P.2d 212, 217–18 (Alaska 1996) (child's preference resulting from his desire to please both parents properly rejected by superior court).

15. *See Fardig,* 56 P.3d at 13 n. 13.

the court noted Kevin's testimony that "the children want to remain together and to be with him." The court also noted that two of the older children, Michael and Julie, "agreed with [Kevin] and claimed to speak the preference of the other minor siblings." Later, in its order on reconsideration, the superior court also found that "[t]he preference of children often is indirect in proof, but here two of the children (one of them an adult) specifically expressed preferences, as did the father express his preferences and his understanding of the children's on cross-examination by [Gail's attorney]." Gail contends that the superior court's preference finding was flawed because it was based on the older children's testimony. She argues that the preference expressed by the older children should not be given weight because it represents Kevin's influence and was not a true preference. Gail argues that the older children's preference is irrelevant because she seeks custody of only the younger children. Finally, Gail contends that the younger children were too young to have formed a trustworthy preference.

Kevin does not point to any better evidence of the younger children's preference in the record; he seems to argue that the older children's preference is more important because they played an important role in raising the younger children. As Gail notes, the only evidence in the record regarding the younger children's preference comes from the older children. There is one sentence in the custody investigator's report from the Thomases' domestic violence proceeding suggesting that the younger children preferred their father. However, this report was not prepared for purposes of determining permanent custody, and was based on interviews with only the five oldest children. Additionally, the superior court does not mention the custody investigator's reports in its findings. There is insufficient evidence in the record to establish the younger children's preference. The record does not support the superior court's finding that all the children preferred to live with Kevin.

■ Moreover, the substantial evidence indicating that the younger children's best interests might not be fairly reflected by the preferences of their adult or nearly grown-up siblings, suggests that a guardian ad litem might have provided a substantial benefit to the younger children and the court alike. Although the parties in a divorce are usually expected to take the initiative in requesting the court to appoint a guardian ad litem, Alaska law vests courts with broad authority to make such appointments and requires them to act on their own initiative "when, in the opinion of the court, representation of the child's best interests ... would serve the welfare of the child."[16] Two relevant factors in deciding whether a guardian ad litem is necessary are the ages of the children and the nature of the parents' claims.[17] Even when neither party requests a guardian ad litem, the court in a child custody case has an independent duty to "represent[ ] the interests of society in promoting the stability and best interests of the family"[18] by appointing a guardian ad litem when circumstances convince the court that "a child's best interests need representation."[19]

The six younger children were between the ages of two and twelve. Julie, one of the older children who testified that she preferred living with Kevin, was seventeen at

---

16. AS 25.24.310(c) ("The court shall require a guardian ad litem when, in the opinion of the court, representation of the child's best interests, to be distinguished from preferences, would serve the welfare of the child."). *See also* Alaska R. Civ. P. 90.7(a) ("[T]he court may appoint a guardian ad litem for the child only when the court finds separate representation of the child's best interests is necessary, such as when the guardian ad litem may be expected to present evidence not otherwise likely to be available or presented, or the proceeding is unusually complex.").

17. *Lacy v. Lacy,* 553 P.2d 928, 930 (Alaska 1976), *superseded by statute on other grounds,* Ch. 63, § 30, SLA 1977, *as recognized in Deivert v. Oseira,* 628 P.2d 575, 579 (Alaska 1981); *Veazey v. Veazey,* 560 P.2d 382, 385 (Alaska 1977).

18. *Veazey,* 560 P.2d at 387 n. 6 (quoting *Kritzik v. Kritzik,* 21 Wis.2d 442, 124 N.W.2d 581, 585 (1963)), *superseded by statute on other grounds,* Ch. 63, § 30, SLA 1977, *as recognized in Deivert,* 628 P.2d at 579.

19. AS 25.24.310(c); *see also Deivert,* 628 P.2d at 579.

the time of trial—just nine months away from becoming an adult upon turning eighteen. The two other older siblings were already adults. Thus we are presented with a situation where six children under the age of thirteen were considered to have a preference for their father purely on the testimony of the father and the older children. Moreover, Gail forcefully claimed that Kevin exerted improper influence on the three older children, held them under his sway, and had turned them against her; ample evidence supported these claims. The older children's actions and testimony arguably showed signs of this kind of influence; in fact, the superior court expressly found that the older children were under Kevin's influence and that even the younger children had likely been influenced, too.

Under these circumstances, the superior court may wish to consider on remand whether a guardian ad litem could be of assistance to the court in separating its consideration of the younger children's best interests from preferences expressed by their older siblings acting on Kevin's behest, as well as from any preferences that might have been expressed by the younger children themselves in order to placate Kevin. As we have recognized on other occasions, a vital part of a guardian ad litem's role in such cases is to "delve" into whether a child's "thinking [was] consciously or subconsciously colored by one parent against the other." [20]

■ The fourth statutory factor the superior court must consider is "the love and affection existing between the child and each parent." [21] The superior court found in its order on reconsideration that "[t]he love and affection of the children and parents was not specifically articulated, but appeared strong for both parents, though perhaps stronger in the father's favor." The court's finding on this point was clearly erroneous given that there was only a brief mention of the younger children's affection in the custody investigator's report. The evidence in the record simply does not support the conclusion that all of the children felt more love and affection

for their father. Although the older children's testimony indicates they preferred their father, this evidence was swayed by Kevin's influence, as was the older children's testimony concerning the younger children's preference. Further, even the older children testified that they felt affection towards Gail. The superior court did not address the issue sufficiently in its decree to make a finding either way.

■ The fifth factor in determining which custody arrangement is in a child's best interests is "the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity." [22] The superior court seemed to address this factor in its reconsideration order when it found that "[t]he length of time in the residence, and under [Kevin's] primary care was fully considered, but not overly weighted." Gail argues that the stability and continuity factor weighs against Kevin because he provided an unsatisfactory environment for the children. Gail further argues that she was an adequate primary caregiver and thus would better provide the children with a stable environment.

The record shows that Gail was the primary caretaker for the children when they were young. As the children matured they helped care for the younger children. Until shortly before her separation from Kevin, Gail was the primary home-school teacher and caregiver for the younger children. The superior court did not find Gail in any way an unfit parent, and Kevin never argued that she was incapable of caring for the children. In context, then, the court's statement that it had fully considered but not "overly weighted" the children's "length of time in the residence, and under [Kevin's] primary care" suggests that the court focused its consideration of the fifth factor solely on the time Kevin spent caring for the children after the parties' separation, overlooking Gail's role as the younger children's primary caregiver before the parties separated. Thus, the court's finding on the fifth factor provides no assurance that the court gave balanced consider-

**20.** *Veazey,* 560 P.2d at 390.

**21.** AS 25.24.150(c)(4).

**22.** AS 25.24.150(c)(5).

ation to the important roles both parents played in providing the children with "a stable, satisfactory environment."[23]

The sixth factor is "the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child."[24] The superior court failed to address this factor in either the decree or the reconsideration order. Gail argues that Kevin's negative feelings towards her and his controlling personality will preclude her from having any relationship with the children, and the record shows that he had been interfering with her ability to visit with the younger children. Kevin contends the factor is a wash between the parties because their feelings towards each other are equally negative. It is not our role to determine whether Gail's arguments have merit by weighing the conflicting evidence and deciding the issue for ourselves. Because the evidence below squarely placed this point in dispute, it was incumbent on the superior court to address and resolve the controversy in its findings so that its decision could be meaningfully reviewed.

The seventh factor is "any evidence of domestic violence, child abuse, or child neglect in the proposed custodial household or a history of violence between the parents."[25] The superior court stated in its order on reconsideration that "[d]omestic violence and drug use were not expressly addressed, primarily because either there was no evidence, insignificant evidence, or muddy evidence, at best, regarding either." This finding is incorrect. Kevin's February 2005 assault against Gail unquestionably qualifies as a serious incident of domestic violence. Kevin pled no contest to the assault, a protective order was entered against him, he admitted the assault at trial, and the older children's testimony made it clear that they were aware of the assault and had been impacted by it. Additionally, there are suggestions of other episodes of domestic violence in the record. The evidence of domestic violence in this case cannot accurately be characterized as "insignificant" or "muddy." The superior court was presented with uncontroverted evidence of a serious episode of domestic violence, and its failure to thoroughly consider that issue and address it in its findings was clearly erroneous.[26]

The superior court did not discuss the eighth factor, evidence of substance abuse,[27] or the ninth factor, "other factors that the court considers pertinent,"[28] but this was not error because these factors are irrelevant in this case.[29]

In summary, the inadequacies discussed above preclude us from meaningfully reviewing the merits of the superior court's decision. The existing findings fail to provide a clear picture of the factors the court considered important; nor does the record otherwise provide a basis to sustain the result reached by the superior court. In its reconsideration order the court stated that the "discussion of its basis for decision may not have listed each of the factors considered, but the mention of each factor is not required as long as it is considered." This statement does not accurately describe the applicable law. It is true that when the facts of a case do not implicate particular best interest factors, those factors need not be discussed in the custody determination. But whenever a factor is substantially disputed, it must be addressed by the superior court in its findings.[30] As discussed above, several of the factors not discussed by the court were implicated in this case and vigorously disputed by

23. *Id.*

24. AS 25.24.150(c)(6).

25. AS 25.24.150(c)(7).

26. Under AS 25.24.150(g), "[t]here is a rebuttable presumption that a parent who has a history of perpetrating domestic violence against the other parent [or] a child" may not be awarded custody, whether sole or joint, physical or legal. Though applicable at the time of the Thomases' divorce trial, Gail did not ask for this presumption against awarding custody to a spouse with a history of perpetrating domestic violence.

27. AS 25.24.150(c)(8).

28. AS 25.24.150(c)(9).

29. *See Virgin*, 990 P.2d at 1045.

30. *See id.*

the parties. The omission of these factors from the superior court's findings precludes us from reviewing the merits of its decision to ensure that it properly exercised its discretion.

We therefore remand the case to the superior court with directions to redetermine the issue of custody based on findings and conclusions in keeping with this decision.[31]

## B. Award of Marital Home

Gail separately challenges the superior court's decision to award the marital home to Kevin. The superior court found that the marital estate included the family's trailer park business and their home on the hillside. After valuing the total estate at $649,000, the court gave Kevin both the marital home and business, ordering him to make an off-setting payment of $325,000 to Gail.

The parties agree that the superior court awarded the marital home to Kevin mainly because it believed that the children should stay in the home. Gail does not challenge this premise; she simply argues that she should be given the marital home because she should have custody of the children. Kevin responds that the superior court properly awarded him the marital home because it houses his business and the children. Our decision to remand this case for a new decision on the issue of custody will provide the superior court with an opportunity to redetermine the award of the marital home on remand if the court gives Gail custody of the children.[32] Accordingly, we need not decide this issue here.

## C. Characterization of Gold Coins as Gail's Separate Property

 Kevin contends in his cross-appeal that the superior court erred in characterizing the gold coins as Gail's separate property and precluding him from receiving a portion of their value. We reject Kevin's argument because the record does not show that Gail intended to contribute the coins to the marital estate.[33] The first step in dividing a marital estate is determining which assets to include in the estate,[34] which requires characterizing the couple's assets as separate or marital.[35] Whether the trial court used the correct legal standard in characterizing property is an issue of law that we review de novo.[36]

 A spouse's separate property can become part of the marital property through transmutation.[37] "Separate property can become marital property where that is the intent of the owner and there is an act or acts which demonstrate that intent."[38] With respect to real property, this requirement may be met where a non-owner spouse "devote[s] substantial efforts to [the property's] management, maintenance, or improvement."[39]

Kevin contends that Gail's exclusive interest in the apartment complex transmuted to become marital property because he managed the apartment complex and worked there without any pay. He reasons that, because the apartment complex was marital property, the gold coins the parties acquired after selling the property also became part of

---

**31.** Although the court's findings are insufficient, Gail's argument that she was effectively denied a hearing at all lacks merit. We decline to address Gail's arguments regarding legal custody because the superior court will reconsider the issue.

**32.** Gail suggests in her briefing that, as of December 2006, Kevin had failed to pay any part of the $325,000 offset he owed for Gail's share of the marital estate. If it appears that compliance with the provisions of the original property order continues to pose a problem, the superior court will also have discretion on remand to reexamine the original award on that ground.

**33.** Kevin also argues that he was incorrectly denied child support by the superior court. This argument fails because the superior court specifi-

cally ordered Gail to pay him child support in its order denying reconsideration.

**34.** *Chotiner v. Chotiner*, 829 P.2d 829, 831 (Alaska 1992).

**35.** *Id.*

**36.** *Martin v. Martin*, 52 P.3d 724, 726 (Alaska 2002).

**37.** *Id.* at 726–27.

**38.** *Chotiner*, 829 P.2d at 832.

**39.** *Martin*, 52 P.3d at 728 (quoting *Chotiner*, 829 P.2d at 832–33) (first alteration in original).

the marital estate. But the superior court considered conflicting testimony on this point and resolved the conflict by expressly finding that Kevin had received compensation for his work at the apartment complex. It is not our place to question the superior court's resolution of factual disputes, especially when the court's resolution turns on issues of testimonial credibility.[40] Given the trial court's superior ability to assess the facts and evaluate the truthfulness of a witness, we must uphold the trial court's ruling on this point.[41]

Kevin also argues that the coins transmuted after being acquired. There was evidence that Gail used a portion of the property sale proceeds to pay for family expenses. Additionally, there was evidence that she had wanted to use the proceeds to purchase an investment for the family and reluctantly agreed to Kevin's demand to use the money to purchase gold coins. Though the parties agreed that the coins were ostensibly purchased to provide the family with "insurance," there is no evidence that the coins were actually used for this or any other purpose. The superior court found that "Gail purchased gold coins with $50,000 of her share [of the property sale proceeds] and the coins remain her independent non-marital property."

We agree with the superior court's ruling. Transmutation requires something more than a bare intent to make separate property marital; the intent must be accompanied by conduct aimed at effectuating that intent.[42] Here, the evidence fails to show any step by Gail that could be construed as an action intended to transmute the disputed coins into marital property. The coins simply remained untouched and unused in the family's vault.[43] Because no act or acts demonstrated an intent by Gail to convey the coins to the marital estate, the superior court properly ruled that the coins continued to be her separate property.

## IV. CONCLUSION

For these reasons, we REMAND the case to the superior court with directions to reconsider and enter new findings on the issue of custody as directed in this opinion; on remand, the court is also DIRECTED to reexamine the issues of legal custody and division of the marital home as necessary in light of its custody ruling on remand. We AFFIRM the superior court's ruling that the gold coins were Gail's separate property.

---

**40.** *See id.* at 730 (refusing to reverse a superior court's implicit decision to credit one spouse's testimony over another's).

**41.** *See Whitesides v. State, Dep't of Pub. Safety, Div. of Motor Vehicles,* 20 P.3d 1130, 1136–37 (Alaska 2001) (a trial court's credibility determination should be accorded deference given its opportunity to observe witnesses and its experience gauging credibility).

**42.** *Chotiner,* 829 P.2d at 832 (transmutation requires "intent of the owner and . . . *an act or acts* which demonstrate that intent") (emphasis added); *cf. N. Pac. Processors, Inc. v. City & Bor-*ough *of Yakutat,* 113 P.3d 575, 585 (Alaska 2005) (finding that, in regards to contracts, "[c]onduct is a better indicator of intent than is testimony").

**43.** Kevin argues that placing the gold in a safe in the family home raised a presumption that Gail intended to contribute it to the marital estate. He analogizes the situation to joint ownership of separate funds resulting from their deposit into joint savings accounts. But the analogy is inapt: Kevin's ability to gain physical access to the gold coins in the family vault hardly equates to the rights of ownership and access conferred by law when funds are banked in a joint account.