NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| KYLE F. BELK, | ) |
| | ) Supreme Court No. S-17386 |
| Appellant, | ) |
| | ) Superior Court No. 3AN-16-04087 CI |
| v. | ) |
| | ) MEMORANDUM OPINION |
| JENNIFER R. BELK, | ) AND JUDGMENT* |
| | ) |
| Appellee. | ) No. 1758 – March 18, 2020 |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Dani Crosby, Judge.

Appearances: Kyle F. Belk, pro se, Saratoga Springs, Utah, Appellant. Jennifer R. Belk, pro se, American Fork, Utah, Appellee.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

## I. INTRODUCTION

A divorced father moved from Alaska to Utah to be near his child and sought a modification of custody reflecting his move that would give him primary physical custody. Following an evidentiary hearing, the superior court increased the amount of the father's visitation but left primary physical custody with the mother, as well as the right to make final decisions if the parents could not agree on issues of legal custody. The father appeals, contending that the superior court abused its discretion in

---

\*      Entered under Alaska Appellate Rule 214.

its best interests analysis and in failing to order a schedule that more closely approximated equal physical custody.

We conclude that the superior court did not clearly err in its findings of fact or abuse its discretion in weighing the best interests factors. We also see no abuse of discretion in the court's crafting of a new custody schedule. We therefore affirm the court's custody order.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Kyle Belk and Jennifer Belk have a daughter, Amy,[1] who was born in January 2008. The couple married later that year. In 2015 they moved from Alaska to Utah, but Kyle soon returned to Alaska. The parties divorced in October 2016. Jennifer remained in Utah with Amy. In the initial custody agreement, Jennifer had primary physical custody of Amy and the parents shared legal custody, with Jennifer having the final say in the event of a disagreement. Amy was to visit Kyle in Alaska every other winter break and every summer break, and Kyle was to have "liberal phone visitation" with Amy four times a week during the school year. In August 2018 Kyle moved back to Utah to be closer to Amy.

### B.    Proceedings

In September 2018 Kyle filed a motion in Alaska superior court to modify custody, seeking "full physical custody" and contending that Jennifer was harming Amy by her poor parenting. The court held an evidentiary hearing the following February and heard testimony from both parents. The court's written order, issued shortly after the hearing, rejected Kyle's request for a change in custody. The court found that Jennifer was "highly attuned to [Amy's] needs" and that Amy was "excelling in school, [had]

---

[1]    We use a pseudonym to protect the child's privacy.

many friends, and [was] well-adjusted." The court found that Jennifer had established a reasonable routine with her work schedule and a friend who was willing to watch Amy when Jennifer worked into the evening. The court declined to adopt Kyle's requests for sole or equally shared physical custody "in light of the desirability of maintaining continuity"; it did, however, modify the existing schedule to allow Kyle more regularly scheduled custody time during the school year and equal time during the summers and winter breaks. Legal custody continued to be shared, with Jennifer having the final say in case of disagreement.

Kyle appeals the custody order.

## III.   STANDARD OF REVIEW

"We 'will not reverse a superior court's custody determination unless it abused its discretion or its controlling factual findings are clearly erroneous.' "[2] A superior court abuses its discretion when it "considers improper factors in making its custody determination, fails to consider statutorily mandated factors, or assigns disproportionate weight to particular factors while ignoring others."[3] A superior court's factual findings are clearly erroneous if we are left "with the definite impression that a mistake has been made."[4]

## IV.   DISCUSSION

### A.   The Superior Court Did Not Clearly Err Or Abuse Its Discretion In Its Best Interests Analysis Under AS 25.24.150.

Alaska Statute 25.24.150 requires a superior court to decide custody

---

[2]   *Parks v. Parks*, 214 P.3d 295, 299 (Alaska 2009) (quoting *Thomas v. Thomas*, 171 P.3d 98, 102 (Alaska 2007)).

[3]   *Id.*

[4]   *Id.*

according to the child's best interests; this requires consideration of eight listed factors as well as "other factors that the court considers pertinent." The court does not need to "discuss each statutory factor in detail"; rather, "the court's findings will be sufficient if they 'give us a clear indication of the factors which [the court] considered important in exercising its discretion or allow us to glean from the record what considerations were involved.' "[5]

In this case, the court stated that it weighed two of the statutory best interests factors "most heavily": each parent's ability to meet Amy's needs (AS 25.24.150(c)(2)) and the length of time Amy has lived in a stable, satisfactory environment and the desirability of maintaining continuity (AS 25.24.150(c)(5)). Kyle conceded at trial that both parents were able to meet Amy's "physical, emotional, mental, religious, and social needs," and he thus does not challenge the court's finding on factor two on appeal. He focuses on factor five — "the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity"[6] — and a factor the superior court did not stress, factor six — "the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child."[7] We address each of these factors in turn.

### 1. The superior court did not clearly err in its findings of fact relevant to AS 25.24.150(c)(5).

A court's consideration of AS 25.24.150(c)(5), the stability and continuity factor, encompasses not only geographical continuity but also relational stability, or

---

[5] *Rego v. Rego*, 259 P.3d 447, 459 (Alaska 2011) (quoting *Ebertz v. Ebertz*, 113 P.3d 643, 648 (Alaska 2005)).

[6] AS 25.24.150(c)(5).

[7] AS 25.24.150(c)(6).

"each parent's respective ability to maintain stable and satisfactory relations between themselves and the child."[8]  The factor should be assessed "in relation to the totality of the circumstances [the children] [are] likely to encounter in their parents' homes."[9]

The superior court observed that Amy had "lived primarily with [Jennifer] since approximately August 2015," that is, since her parents' separation when she was seven years old, and that she had "thrived in [Jennifer's] care."  The court found that Jennifer was "highly attuned to [Amy's] needs, and the evidence established that she [had] always made [Amy] her priority."  The court further found that Amy was "excelling in school, [had] many friends, and [was] well-adjusted" and that Jennifer had "managed, with the help of her support system, to craft a routine that works for [Amy]" despite a "somewhat challenging work schedul[e]."

Kyle challenges the finding that Jennifer was successfully managing her "challenging work schedul[e]" with the help of a reasonable "support system."  He argues that the "support system" on which the court's finding relies is the home of Jennifer's friend Becky, which, he argues, is unsafe for a number of reasons:  (1) alcohol is present and accessible to Amy; (2) Amy is left unattended for "long periods of time"; (3) there are two "teenage boys in the house [who] have notable behavior issues"; and (4) Becky often picks Amy up from daycare while on narcotic pain medications she takes for a back injury.  Kyle argues that because of these issues, the court erred by failing to recognize that he, rather than Becky, should be first choice as Amy's caregiver whenever Jennifer has to work, and that this necessitates a custody schedule that is closer to 50/50.

---

        **8**        *Meier v. Cloud*, 34 P.3d 1274, 1279 (Alaska 2001) (quoting *McQuade v. McQuade*, 901 P.2d 421, 426 (Alaska 1995)).

        **9**        *Houston v. Wolpert*, 332 P.3d 1279, 1284 (Alaska 2014) (first alteration in original) (quoting *Evans v. Evans*, 869 P.2d 478, 482 (Alaska 1994)).

But not all of these issues were litigated in the trial court. In his motion to modify custody, Kyle included allegations that Jennifer and Amy had previously lived in the basement of a friend's house where there were "2 teenage boys, an open bar in the living room," and "long periods of time" when Amy was unsupervised. At the evidentiary hearing he raised the issue of Jennifer's friend Becky's "open bar," though he disclaimed any belief that Jennifer had a substance abuse problem. Jennifer testified that she and Amy had their own "separate living quarters" in the basement when they lived with Becky, that Amy knew not to drink alcohol, and that Becky's family did not drink around Amy. More importantly, there was no dispute that Jennifer had just recently bought her own house, where she and Amy now lived. Jennifer still depended on Becky for after-school care until 8:30 p.m. three nights a week and on alternate Saturdays, unless Amy went to a school friend's house instead. But Kyle offered no evidence at trial about the two boys "with behavior issues," about Becky's alleged use of prescription narcotics, or about long periods when Amy went unsupervised.

The court did hear evidence, however, that Kyle's relationship with Amy lacked stability. The court observed that Kyle left Amy unexpectedly when he and Jennifer separated, which was "a pretty awful emotional experience" for the child. Jennifer testified that Amy was "having a hard time" when she visited Kyle and was not having her emotional needs met. She testified that Kyle did not have a bed for Amy until recently, so Amy had trouble falling asleep when she stayed with him. This was corroborated by the child custody investigator, who reported that while both parents were "capable of meeting [Amy's] general needs," Jennifer had "been more sensitive to [Amy's] emotional needs and [had] clearly made [Amy] her top priority."

Kyle argues that Amy's anxiety about visitation was caused not by him, but rather by the fact that Jennifer was making visitation difficult. The court acknowledged that Jennifer was initially "protective" of Amy after Kyle's return to Utah, but the court

credited Jennifer's explanation: that in light of Kyle's abrupt departure in 2015, she was concerned about the emotional impact on Amy if it were to happen again. The court also acknowledged that Amy could, "over time, adjust to more time with her father" and that Kyle had moved back to Utah in hopes of making this happen.

Kyle does not persuade us that the court overlooked any relevant evidence in its consideration of the stability and continuity factor, or that it clearly erred in its findings of fact. We are especially deferential to the trial court's findings when, as here, they are based primarily on oral testimony and require determinations of credibility and the weight to give conflicting evidence.[10] The superior court did not clearly err when it determined that factor five, the stability and continuity factor, favored Jennifer.

### 2. The superior court did not clearly err in its findings of fact relevant to AS 25.24.150(c)(6).

Kyle also contends that Jennifer "has no desire or willingness to foster a relationship with the other parent and child," implicating AS 25.24.150(c)(6). He argues that Jennifer "has shown no desire to communicate or facilitate an open relationship," that she communicates only by email, and that she refused to allow visitation for nearly three months after his move back to Utah. Jennifer responds that she chooses to communicate by email because of "past harassment." She testified that she "was unaware of [Kyle's] intentions" when he returned to Utah, noting that Amy "had a lot of abandonment feelings" caused by Kyle's abrupt departure in 2015. As noted above, the superior court credited Jennifer's explanation, finding that she was "just being really, really protective of" Amy while the child "had some difficulties adjusting" to her father's renewed presence in her life. Although Kyle questions the truth of some of Jennifer's

---

**10** *Collins v. Hall*, 453 P.3d 178, 186 (Alaska 2019).

testimony, we defer to the superior court's credibility determination, particularly as it is largely based on oral testimony.[11]

Ultimately, the superior court's findings on factor six were equivocal, and — unlike factors two and five — the court did not explicitly weigh factor six in favor of either parent. The court found that both parents could be better at working together, and it encouraged them both to "step[] up to a little bit more of a positive relationship over time." The court ordered that they "not disparage one another in [Amy's] presence" and stressed that improving their communication and "co-parenting in a productive, positive way" would benefit their daughter. The parents' poor communication required the court to give one party — Jennifer — the final say on issues of legal custody, which was an appropriate response to the problem.[12]

In sum, we cannot conclude that the court erred in its consideration of factor six. We see no clear error in the findings of fact relevant to this factor and no abuse of discretion in the court's weighing of the factors, including its implicit determination that factor six did not strongly favor either party.

## B. The Superior Court Did Not Abuse Its Discretion In Setting The Custody Schedule.

Kyle also takes issue with the new custody schedule set by the court's order on modification. He argues that the court should have established something closer to equally shared physical custody: a 3-4-4-3 schedule "with a right of refusal clause" (meaning that the non-custodial parent would be the first option for taking care of Amy when the other was working) or having Amy spend every weekday during the school year with Kyle unless Jennifer was off work in time to pick their daughter up from

---

[11] *Id.*

[12] *Houston*, 332 P.3d at 1285 (recognizing that "[j]oint legal custody may be denied if the parents cannot communicate effectively").

daycare at 6:00 p.m., in which case "overnight could be at her house." We conclude, however, that the court did not abuse its discretion in crafting a different schedule.

The factual starting point of Kyle's motion to modify custody was that by moving to Utah he was now in a position to assume more responsibility for the child's care. He sought "full physical custody" on grounds that Jennifer had proven unable to provide "stability and proper parenting." Although the court rejected his arguments about Jennifer's parenting abilities following the evidentiary hearing, it did modify the custody schedule to reflect Kyle's relocation, acknowledging that the schedule could change further as Amy "adjust[s] to more time with her father." The court allowed Kyle to have every other weekend with Amy, a weekday visit every Wednesday evening, and an additional Saturday every month "when [Jennifer] is working and it is otherwise her weekend with" Amy. The summer schedule was to be 3-4-4-3 (three nights with Jennifer, four with Kyle, four with Jennifer, then three with Kyle, repeating in the same sequence). Winter break was to be shared evenly, with the parties alternating between the first half and the second half.

Jennifer argues that Kyle's proposed 3-4-4-3 schedule during the school year would not be in the best interests of Amy's "continuity in her school endeavors," and the superior court apparently agreed. This conclusion was consistent with the court's findings that Amy was "excelling in school" and with its other findings about stability and continuity described above. The court noted, however, that the parties were "free to mutually agree to times that make sense for them," inviting them to modify the schedule in any respect by written agreement and (for permanent changes) by filed stipulation. Overall, the schedule appears intended to begin the process of increasing Kyle's custody time as the parties work on better communication and Amy becomes

more comfortable spending time with her father.  Having reviewed the order in this context, we see no abuse of the court's broad discretion in fashioning its details.

## V.     CONCLUSION

We AFFIRM the superior court's custody order.