NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JORDAN F., | ) | |
| | ) | Supreme Court No. S-19282 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-22-06010 CI |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| CAITLIN B., | ) | AND JUDGMENT* |
| | ) | |
| Appellee. | ) | No. 2135 – February 25, 2026 |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Adolf V. Zeman, Judge.

Appearances: Jimmy E. White, Hughes White Colbo & Tervooren, LLC, Anchorage, for Appellant. Notice of non-participation filed by Rob Sato, Sato Law, LLC, Anchorage, for Appellee.

Before: Carney, Chief Justice, and Borghesan, Henderson, Pate, and Oravec, Justices.

## I.    INTRODUCTION

The superior court awarded parents joint legal and shared physical custody of their minor child. Despite considerable evidence in the record related to domestic violence, the court did not make findings regarding the parents' alleged history of domestic violence.

---

\*      Entered under Alaska Appellate Rule 214.

The father appeals. He argues the court's findings about domestic violence were inadequate and that the court failed to consider factors related to domestic violence. He also argues that the court erred by finding it was not in the child's best interests to change the child's name.

It was legal error to fail to make findings about domestic violence. We therefore vacate the court's order and remand for the court to make specific findings related to domestic violence and to conduct a best interest analysis in light of those findings. We affirm the court's decision regarding the request to change the child's name.

## II. FACTS AND PROCEEDINGS

### A. Facts

Jordan F. and Caitlin B.[1] started dating in July 2016 and dated on and off for several years, both before and after their child was born. After the child's birth in 2019, Caitlin and the child moved in with Jordan. The parents separated in October 2021 when Caitlin moved out with the child. From November 2021 through April 2022, the parents shared 50/50 custody.

In late April 2022, Jordan was taking care of the child at Caitlin's home while Caitlin was at rugby practice. After Caitlin returned and the child was in bed, the parents had drinks together. An argument led to a physical altercation. Caitlin called the police, who arrested Jordan and filed a number of charges, all of which were subsequently dropped. In May, Caitlin obtained a short-term domestic violence protective order (DVPO) against Jordan and primary physical custody of the child through the trial.[2]

---

[1] We use initials in lieu of the parties' last names to protect the family's privacy.

[2] Caitlin did not file a petition for a long-term DVPO after the short-term DVPO expired.

Between December 2022 and January 2024, a number of reports were made to the Office of Children's Services (OCS) alleging that Caitlin, her husband,[3] her mother, and her stepfather were mistreating the child. OCS investigated one of the reports in December 2023 that alleged that the child had been physically abused and injured in Caitlin's care. The report alleged that the child's face and neck had bruising and "several large blisters." OCS closed the case as "not substantiated" after a medical provider concluded that the redness was likely an allergic or chemical reaction caused by an ointment that Caitlin had been applying. The OCS worker noted that the "parents have significant issues communicating with each other and cannot co-parent."

## B.    Proceedings

Jordan filed a complaint for child custody and a petition to change the child's name on the same day Caitlin obtained the DVPO against him. The superior court held a custody trial over four days from April to June 2024. Eight witnesses testified, including Caitlin and Jordan.

Jordan called five witnesses: his brother and sister-in-law, two people who had supervised his visits with the child, and his father. His sister-in-law testified that Jordan was a "present parent" and his brother testified that he was "caring and helping" as well as "fair and gentle" with the child. The visitation supervisors, who were required to supervise Jordan's visits with the child under the terms of the DVPO, also testified on Jordan's behalf. They similarly described an attentive parent who was playful with the child.

Jordan's father testified about Jordan's ability to parent and how Jordan was a caring parent and put the child's needs first. He testified that he and his wife had reported concerns about Caitlin's care of the child to the police and OCS.

---

[3]    Caitlin began a relationship with another man in late 2022 and married him in November 2023.

Jordan also testified. He acknowledged that he disagreed with Caitlin about the child's schooling and that he had concerns about Caitlin making decisions in the child's best interests. He testified that he was concerned about the child's health and safety and filed an OCS report against Caitlin after she and her husband had behaved inappropriately with the five-year-old child.

Jordan testified that he sought sole legal custody to "make decisions in [the child's] best interest[s] for schools and . . . health." He stated that it would be in the child's best interests to award legal custody to him because of Caitlin's "domestic violence" and "abuse."

Jordan also testified about the incident that led to Caitlin obtaining a DVPO against him. He stated that after the child was in bed and he made Caitlin and himself a drink, Caitlin asked him to leave. He said that she assaulted him — choking him, squeezing his wrist, and hitting him in the head.

After Jordan's testimony, Caitlin called the OCS worker who had investigated the child's bruises and rash. The OCS worker testified that OCS had arranged both a medical examination and a forensic interview with the child, looking for signs of physical abuse, sexual abuse, and neglect, and that OCS had not found any. He noted that the child had mentioned that the "parents are kind of mean to each other" but that OCS had not found any signs of mistreatment.

Caitlin testified that the child was happy and healthy and got along very well with Caitlin's husband. She also testified about the events leading to the DVPO. She said she received a text from her husband (then-boyfriend), which angered Jordan. She testified that their argument escalated and Jordan pushed her to the floor. She stated that when she told him to leave, he took her phone and began recording. Caitlin said that in an attempt to get her phone, she jumped on his back. She said she "put[] her hands around his neck just trying to get over him" to reach the phone but that she "didn't put my hands on his neck."

Caitlin testified that she believed that both she and Jordan loved their child and could work toward the child's best interests. She testified that they could put behind them whatever mistakes each had made in the past and work together to focus instead on the child's future. She acknowledged that Jordan and the child have a positive, loving relationship and that he is a "great dad." Caitlin asserted that 50/50 shared custody would benefit the child with equal time with both parents, and that it would reduce conflict and limit the child appearing to have to choose sides.

The court issued a final custody order, finding that joint legal and shared physical custody was in the child's best interests. In response to Jordan's objections and Caitlin's response, it issued a supplemental order several months later. The supplemental order modified the custody schedule and denied Jordan's request to change the child's name.

Jordan appeals.[4]

## III. STANDARD OF REVIEW

"Superior courts have broad discretion in child custody decisions, and we will reverse only if findings of fact are clearly erroneous or if the superior court abused its discretion."[5] "A factual finding is 'clearly erroneous when a review of the record leaves us with the definite impression that a mistake has been made.' "[6] A superior court abuses its discretion when it "considers improper factors in making its custody determination" or "assigns a disproportionate weight to particular factors while

---

[4]    Caitlin did not participate in the appeal.

[5]    *Geldermann v. Geldermann*, 428 P.3d 477, 481 (Alaska 2018) (quoting *Riggs v. Coonradt*, 335 P.3d 1103, 1106 (Alaska 2014)) (internal quotation marks omitted).

[6]    *O'Brien v. Delaplain*, 556 P.3d 1170, 1178 (Alaska 2024) (quoting *Rosemarie P. v. Kelly B.*, 504 P.3d 260, 264 (Alaska 2021)).

ignoring others."[7] However, "[w]e review questions of law and the trial court's application of the law to facts de novo."[8]

A superior court's decision whether to grant a petition to change a child's name is "subject to review under an abuse of discretion standard."[9]

## IV. DISCUSSION

Jordan argues that the superior court failed to make sufficient findings about domestic violence between him and Caitlin and that its final custody order gave no reasoning or insight into how the best interest factors were considered or weighed. He also argues that there were multiple instances of negligence or mistreatment of the child that the court failed to address in its best interest analysis. And he argues that the court abused its discretion by finding that his requested name change would not be in the child's best interests.

Because it was legal error to not make findings of fact regarding domestic violence given the evidence presented, we remand for the court to make such findings and conduct its best interest analysis in light of those findings. But the superior court did not abuse its discretion by determining that changing the name of the child would not be in the child's best interests.

### A. It Was Legal Error To Fail To Make Findings About Domestic Violence.

Jordan argues that the superior court did not make findings related to the parties' allegations of domestic violence, and in particular, did not address the evidence that Caitlin choked him, hit him, threw books at him, and committed other acts of domestic violence. He argues that failure leaves no basis to determine how the court

---

[7] *Parks v. Parks*, 214 P.3d 295, 299 (Alaska 2009) (quoting *Thomas v. Thomas*, 171 P.3d 98, 102 (Alaska 2007)) (internal quotation marks omitted).

[8] *Riddle v. Lanser*, 421 P.3d 35, 44 (Alaska 2018) (quoting *Maddox v. Hardy*, 187 P.3d 486, 491 (Alaska 2008)) (internal quotation marks omitted).

[9] *Lone Wolf v. Lone Wolf*, 741 P.2d 1187, 1192 (Alaska 1987).

weighed or evaluated the statutory best interest factors in reaching its custody decision.[10]

The superior court noted both at the trial and in its order that its decision would be based on the child's best interests and its consideration of the statutory best interest factors.[11] And its order seemed to refer to most of the factors, acknowledging — without expressly naming each factor — the parents' ability to meet their child's needs.[12] It ordered joint legal custody and it provided that disagreements "on major issues such as schooling" would be decided with the help of a court-appointed parenting coordinator. The court detailed the custody schedule and addressed the parents' shared responsibility to facilitate time with each of them, visits with family, vacations, extracurricular activities, medical appointments, and the child's general emotional well-being. The court explained that it was making a detailed custody order "[b]ecause of the difficulty the parties have had in communicating and compromising." And it found that the custody order and visitation schedule were in the child's best interests.

---

[10] *See* AS 25.24.150(c)(1)-(9) (requiring court to consider factors including child's needs, preferences, and living environment, child's relationship with parents, parents' abilities, and "any evidence" of domestic violence, abuse, neglect, or "violence between the parents").

[11] Under AS 25.24.150(c) the court is only required to address those factors which are "actually relevant in light of the evidence presented." *Thomas*, 171 P.3d at 102-03 (quoting *Virgin v. Virgin*, 990 P.2d 1040, 1045 (Alaska 1999)) (internal quotation marks omitted).

[12] *See* AS 25.24.150(c)(1) (child's physical, emotional, mental, religious, and social needs), (2) (parent's "capability and desire" to meet child's needs), and (6) (parent's "willingness and capability" to facilitate and encourage close relationship between other parent and child).

But the court was also required to make specific and detailed findings regarding the domestic violence they alleged, and it did not.[13] We have held that "[t]he superior court must make detailed findings on alleged incidents of domestic violence."[14] And we have clarified that specific findings "are necessary on appeal to give us a clear understanding of the basis of the trial court's decision, and to enable [us] to determine the ground on which the trial court reached its decision,"[15] and that "[s]pecific findings are especially crucial when the superior court makes a determination as to a parent's history of perpetrating domestic violence."[16]

A trial court "commits legal error if it 'fail[s] to make factual findings appropriate to the relevant legal test.' "[17] The failure to make findings about domestic violence for our review, despite the extensive evidence of domestic violence presented at trial, including an incident that led to the issuance of a DVPO, was legal error. Explicit consideration of AS 25.24.150(c)(7) was required because it was "relevant in light of the evidence presented."[18]

---

[13] *See* AS 25.24.150(c)(7) (evidence of domestic violence, child abuse, or child neglect in proposed custodial household or history of violence between the parents); AS 25.24.150(d) (requiring court to consider only facts directly affecting child's well-being), (g) (rebuttable presumption against awarding custody to parent with history of domestic violence against other parent), and (h) (allowing presumption to be rebutted by completion of batterers intervention program, proof of no substance abuse, and "that the best interests of the child require" custody award to parent).

[14] *Sarah D. v. John D.*, 352 P.3d 419, 429 (Alaska 2015).

[15] *Id.* (quoting *Merrill v. Merrill*, 368 P.2d 546, 548 (Alaska 1962)) (internal quotation marks omitted).

[16] *Solomon v. Solomon*, 420 P.3d 1234, 1242 (Alaska 2018).

[17] *Matter of Est. of Rodman*, 498 P.3d 1054, 1073 (Alaska 2021) (quoting *Anchorage Chrysler Ctr., Inc. v. DaimlerChrysler Corp.*, 129 P.3d 905, 916 (Alaska 2006)).

[18] *Thomas v. Thomas*, 171 P.3d 98, 102-03 (Alaska 2007) (quoting *Virgin v. Virgin*, 990 P.2d 1040, 1045 (Alaska 1999)) (internal quotation marks omitted).

Jordan argues that there were also multiple instances of "negligence or mistreatment" of the child that the court did not address under the best interest factors. But the court's order specifically addressed these concerns regarding communication, especially about the child's health. It also addressed the child's needs, the parents' ability to meet those needs, the love and affection existing between the child and her parents, and the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child.[19] The court's findings were supported by testimony at trial.[20]

But nowhere did the court make findings regarding the evidence of domestic violence that was presented. This was legal error and requires a remand for the court to do so.

### B. The Superior Court Did Not Abuse Its Discretion By Determining That Changing The Child's Name Would Not Be In Her Best Interests.

Jordan also appeals the court's denial of his petition to change the child's name. He specifically sought to change the child's last name from Caitlin's to Jordan's, and to include a second middle name.

The process for changing a child's name is governed by AS 09.55.010 and Alaska Civil Rule 84.[21] A petition for a name change will not be granted "unless the court finds sufficient reasons for the change and also finds it consistent with the public

---

[19]     *See* AS 25.24.150(c)(1), (2), (4), & (6).

[20]     We have held that it is "preferable, but not necessary, for the court to set out 'ultimate' or 'wrap-up' findings that relate its factual findings to its legal conclusion that a certain custody disposition is in a child's best interests." *Thomas*, 171 P.3d at 103 (quoting *Virgin*, 990 P.2d at 1046-47).

[21]     AS 09.55.010(a); Alaska Civil Rule 84(e).

interest."[22] And Civil Rule 84 requires that a child's name change must be in the child's best interests.[23]

The burden of proving that the name change was in the child's best interests was on Jordan as the one proposing the change.[24] In *Acevedo v. Burley* we held that a superior court deciding whether to grant a name change petition should consider the child's and parents' desires, the reason for the change, the child's age and maturity, the family's situation, the child's relationship with each parent, any misconduct toward the child by a parent opposing the change, and the name that the child has typically been called.[25] We have also acknowledged other potentially relevant considerations, including: the length of time the child has been called the current name; whether the change would cause insecurity or confusion about the child's identity; the impact the change might have on the child's relationship with each parent; the motivation of the party proposing the change; "the identification of the child with a particular family unit, giving proper weight to step-parents, step-siblings and half-siblings who comprise that unit"; or "any embarrassment, discomfort, or inconvenience that may result if the child's surname differs from that of the custodial parent."[26]

Jordan presented no evidence about any of these factors. He stated only that he wanted the child to have his name "for personal reasons and not to avoid judgements, debts, obligations, or to defraud any person" and that "[t]he reasons stated are consistent with the public interest."

---

[22] AS 09.55.010(a).

[23] Alaska Civil Rule 84(e).

[24] *See In re A.C.S.*, 171 P.3d 1148, 1150-51 (Alaska 2007).

[25] 994 P.2d 389, 391 (Alaska 1999).

[26] *In re A.C.S.*, 171 P.3d at 1153 (quoting Lisa Kelly, *Divining the Deep and Inscrutable: Toward a Gender-Neutral, Child-Centered Approach to Child Name Change Proceedings*, 99 W. VA. L. REV. 1, 79 (1996)).

The court nonetheless considered the appropriate criteria: the child's age;[27] that the child, classmates, and teachers knew the child by the current name; and that a name change would not strengthen the relationship between father and child. It found that Jordan did not demonstrate why a name change would be in the child's best interests, and suggested that he was motivated instead by his "focus on infidelity" by Caitlin. The superior court did not abuse its discretion by finding that granting a name change would not be in the child's best interests.

## V.    CONCLUSION

We VACATE the court's order and REMAND for the court to make explicit findings regarding domestic violence and to reconsider its best interest analysis in light of those findings. We AFFIRM the denial of Jordan's petition to change the child's name.

---

[27]    At the time of the court's order, the child was five years old.